**ALLSTATE FINANCIAL CORPORATION, Appellee,**

v.

**WESTFIELD SERVICE MANAGEMENT COMPANY et al.;**

**McInnis, Appellant.**

[Cite as *Allstate Financial Corp. v. Westfield Serv. Mgt. Co.* (1989), 62 Ohio App.3d 657.]

Court of Appeals of Ohio,
Warren County.

No. CA88–07–058.

Decided May 1, 1989.

658

*Revelson & Herdman, Jay D. Revelson* and *Roy H. Stoess, Jr.,* for appellee.

*Emens, Hurd, Kegler & Ritter* and *John P. Brody,* for appellant James J. McInnis.

*Per Curiam.*

This is an appeal by defendant-appellant, James J. McInnis, from a decision by the Warren County Court of Common Pleas allowing plaintiff-appellee, Allstate Financial Corporation ("Allstate"), to foreclose on a piece of real estate owned by McInnis.

Community Assistance Corp. ("CAC") is a for-profit corporation controlled by Charles Virga and Allan Eddy. CAC, in turn, set up and controlled several non-profit corporations, including Westfield Service Management Co. ("Westfield"), to operate group homes for the mentally retarded. CAC Properties is an Ohio partnership in which David Latanick, Virga and Eddy were partners.

The Emily Jones Home in Lebanon, Ohio, was a group home formerly operated by Production Services Unlimited ("PSU") under a contract with the state of Ohio. PSU was paid for its services by the Ohio Department of Mental Retardation and Developmental Disabilities ("ODMRDD").

On October 17, 1983, CAC Properties purchased the Emily Jones property. On October 31, 1983, CAC Properties executed a mortgage to County Savings Association in the amount of $200,000. The deed and mortgage were subsequently recorded. After the sale, PSU no longer operated the Emily Jones Home. It was operated by Westfield.

On December 5, 1983, McInnis entered into a purchase and sale agreement with CAC Properties for the purchase of the Emily Jones property. The sale price was $350,000. The agreement provided that McInnis pay $75,000 in cash, assume the first mortgage to County Savings in the amount of $200,000, and pay $75,000 in the form of a note and second mortgage to CAC Properties.

McInnis did not attend the closing on December 5, 1983, which was held at Latanick's office. The contract was executed through his agent. At that time, McInnis wired $75,000 cash to a bank account in the name of CAC (not CAC Properties, the title owner). McInnis did not assume the first mortgage

to County Savings at that time because he did not wish to pay the additional costs and points. A quitclaim deed was executed by Virga and Latanick on behalf of CAC Properties.

The quitclaim deed was not delivered to McInnis until he visited Latanick's office sometime in February 1984. He instructed Latanick not to record the deed but to hold it for him until he could arrange more favorable financing.

After McInnis purchased the property, he leased the facility to CAC for use by Westfield. On October 26, 1984, Westfield entered into a purchase and security agreement with Allstate which provided for factoring of Westfield's accounts receivable. The agreement was signed on behalf of Westfield by Virga as president and Eddy as secretary although neither actually held those positions. Allstate also entered into several factoring agreements with similar entities in other states controlled by Eddy and Virga.

Under the agreement with Westfield, Allstate would make cash advances to Westfield on a more or less monthly basis. Allstate would then collect payment from ODMRDD on receivables assigned to it by Westfield. Allstate advanced seventy percent of the amount of the receivables and retained the balance of thirty percent as a cushion against any potential adjustments by ODMRDD. Allstate's earnings depended on how long it took to receive payment of the receivables from ODMRDD. For example, Allstate's earnings were 3.5 percent of the receivable if it was paid within fifteen days. Allstate then forwarded the thirty percent retained less its earnings and any adjustments by ODMRDD back to Westfield.

The factoring agreement granted Allstate a first priority security interest in the accounts receivable. Allstate filed the proper financing statements. It also obtained ODMRDD's consent to the agreement.

However, Westfield had not yet obtained contracts with ODMRDD and, for a while, ODMRDD was still issuing payments to PSU and to other former operators of the Emily Jones Home that had assigned their operation to Westfield. Consequently, Allstate requested additional security.

On November 15, 1984, CAC Properties granted Allstate a second mortgage on the Emily Jones property. The second mortgage deed was signed by Latanick as general and managing partner of CAC Properties. Virga misrepresented to Latanick that the transaction had been approved by McInnis. Allstate conducted a title examination and found the only encumbrance of record to be the first mortgage to County Savings. It recorded the mortgage deed on November 16, 1984.

The mortgage deed contained three conditions which had to be fulfilled before the mortgage could be released: (1) Allstate had to perfect its security

interest in Westfield's receivables, (2) PSU and the other former operators had to ratify endorsement of checks originally issued to them by ODMRDD, and (3) PSU and the other operators had to execute a release of claims against checks from ODMRDD.

Beginning in November 1984, Allstate made periodic cash advances to Westfield under the terms of the factoring agreement. On May 21, 1985, Virga sent a mailgram to Allstate authorizing it to deposit funds due to Westfield into CAC's bank account effective April 1, 1985.

Sometime in January 1985, McInnis learned from Latanick that CAC Properties had executed the second mortgage on the Emily Jones property. He instructed Latanick to immediately record the quitclaim deed which Latanick did on February 1, 1985. On March 7, 1985, Latanick wrote a letter to Robert Harris, Allstate's legal counsel, demanding that the mortgage be released. The letter did not mention McInnis or indicate in what capacity Latanick was acting. The reason given for the demand of release was that the mortgage conditions had been fulfilled. Allstate refused to release the mortgage stating that the conditions had not been fulfilled because PSU had not yet executed a ratification and release.

From February 1985 until May 1, 1985, there was a lull in the transactions. Allstate stopped advancing funds and ODMRDD stopped sending payment on receivables. Allstate assessed liquidated damages against Westfield for failure to factor enough receivables. However, testimony indicated that Allstate did not consider Westfield's account to be terminated.

On August 23, 1985, McInnis discovered that Allstate had not released the second mortgage. On August 26, 1985 he sent a mailgram to Allstate informing it of his ownership of the Emily Jones property. Allstate rejected his demand that the mortgage be released. However, Harris advised Allstate that it could no longer rely on the mortgage. Nevertheless, Allstate advanced additional money to Westfield totaling $82,040. On September 3, 1985, Latanick again wrote to Harris demanding that the mortgage be released. Allstate again refused.

On September 27, 1985, Allstate obtained a default judgment against Westfield in Virginia in the amount of $183,227.67. On October 11, 1985, the certificate of judgment was filed in the Warren County Court of Common Pleas. Allstate filed a complaint on November 7, 1985 demanding judgment for that amount and foreclosure on the Emily Jones property.

A trial was held on October 1, 1987. The trial court in its decision held that Allstate had a valid mortgage; that it acted reasonably and in good faith; that it had the status of a bona fide purchaser; and that the conditions of the mortgage were not fulfilled. It found that the amount secured by the

mortgage was $71,513 and that Allstate was entitled to judgment against Westfield in the amount of $25,953. This appeal followed.

■ McInnis presents eight assignments of error for review. In his first assignment of error, he states that the trial court erred in failing to decide upon the merits of his counterclaim to set aside the fraudulent conveyance between Allstate and Westfield. He argues that as a creditor of Westfield, he is entitled to have the transfer under the factoring agreement set aside because it rendered Westfield insolvent and was made without fair consideration. We find this assignment of error is not well taken.

On December 16, 1985, McInnis filed a counterclaim alleging that he had an equitable vendee's lien in the Emily Jones property which had priority over the second mortgage in favor of Allstate. On June 8, 1987, he filed a supplemental counterclaim alleging that the factoring agreement between Allstate and Westfield constituted a fraudulent conveyance.

Evidence relevant to the fraudulent conveyance issue was presented to the trial court. In its decision dated March 8, 1988, the trial court dismissed McInnis' counterclaim relating to the vendee's lien stating that whatever lien right he may have acquired was not superior to Allstate's claim under the mortgage. It stated, "we find against McInnis on his counterclaim."

On May 13, 1988, McInnis filed a motion to reconsider, stating that the trial court failed to rule on his supplemental counterclaim. On June 7, 1988, the trial court issued a one-sentence denial of his motion to reconsider. On June 28, 1988, the trial court filed a judgment entry which stated that McInnis' counterclaim and supplemental counterclaim were denied.

The trial court did not set out findings of fact and conclusions of law relating to the fraudulent conveyance issue and McInnis did not request them pursuant to Civ.R. 52. However, evidence and argument were presented on this issue and the trial court specifically found against McInnis on his supplemental counterclaim. In the absence of findings of fact and conclusions of law relating to fraudulent conveyances, we must presume the regularity of the proceedings in the trial court and that the proper rules of law were applied. *Brescoll v. Nationwide Mut. Ins. Co.* (1961), 116 Ohio App. 537, 22 O.O.2d 423, 189 N.E.2d 173, paragraph four of the syllabus; see, also, *Security Ins. Co. v. Regional Transit Auth.* (1982), 4 Ohio App.3d 24, 26, 4 OBR 45, 47–48, 446 N.E.2d 220, 222–223, citing *In re Sublett* (1959), 169 Ohio St. 19, 7 O.O.2d 487, 157 N.E.2d 324. Accordingly, McInnis' first assignment of error is overruled.

■ In his second assignment of error, McInnis states that the trial court erred in finding against the manifest weight of the evidence that Allstate held

a valid mortgage on the subject real estate and that the second mortgage deed constitutes a valid lien. He argues that the conditions in the mortgage were satisfied since Allstate had adequately protected its interest in the receivables which was the purpose behind the conditions. Therefore, it no longer constituted a valid lien on the property. McInnis also argues that the relationship between Westfield and Allstate was terminated in February 1985. At that time, according to McInnis, Westfield no longer owed Allstate anything and the mortgage should have been released. We find this assignment of error is not well taken.

"Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus; *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 411–412, 461 N.E.2d 1273, 1276.

There was competent, credible evidence to show that Allstate never received the ratification and release from PSU as required by the conditions of the mortgage. There was also evidence showing that the purpose behind the conditions in the mortgage, *i.e.,* securing Allstate against the possibility that PSU would assert a claim against it for depositing and endorsing checks which were made payable to PSU, was not fulfilled. Further, there was evidence showing that the relationship between Allstate and Westfield was never terminated. Accordingly, McInnis' second assignment of error is overruled.

■ In his third assignment of error, McInnis states that the trial court erred in failing to decide whether Westfield and Allstate entered into a valid agreement where the agreement was not executed by an authorized agent. He argues that the factoring agreement was void since Virga and Eddy signed as president and secretary of Westfield when they did not hold those positions. He also argues that Allstate did not act in good faith since it did not ascertain the scope of their authority to contract for Westfield. We find this assignment of error is not well taken.

A principal impliedly ratifies the unauthorized act of an agent in signing a contract when the principal fails to repudiate the contract within a reasonable time. This is particularly true when the principal accepts the benefits of the unauthorized act. *United States Rolling Stock Co. v. Atlantic & Great Western RR. Co.* (1878), 34 Ohio St. 450, 454–456; see, also, *Campbell v. Hospitality Motor Inns, Inc.* (1986), 24 Ohio St.3d 54, 57, 24 OBR 135, 137–138, 493 N.E.2d 239, 241–242; *London & Lancashire Indemn. Co. v. Fair-*

*banks Steam Shovel Co.* (1925), 112 Ohio St. 136, 153–154, 147 N.E. 329, 334–335.

Westfield did not at any time repudiate the factoring agreement with Allstate. It further received the benefit of approximately $400,000 cash advanced to it by Allstate. Assuming Virga and Eddy did not possess the authority to bind Westfield, even though they were the principal owners of the entities involved in this litigation, it is apparent that Westfield impliedly ratified the factoring agreement.

McInnis contends that Westfield did not receive the benefit of the unauthorized acts of Virga and Eddy. He argues that Allstate advanced funds under the agreement, not to Westfield, but to the for-profit CAC and effectively assisted Virga and Eddy in defrauding Westfield's creditors.

The evidence contained a mailgram from Virga to Allstate authorizing Allstate to deposit funds due to Westfield into CAC's bank account and some checks made out to both Westfield and CAC. However, no evidence was presented that Westfield did not receive the funds or that Westfield ever complained about not receiving the funds. Further, no evidence was presented showing that Allstate knew or had reason to know that Virga was defrauding Westfield. In the absence of findings of fact and conclusions of law on this issue, we cannot say that the trial court erred in failing to find the factoring agreement void. Accordingly, McInnis' third assignment of error is overruled.

■ In his fourth assignment of error, McInnis states that the trial court erred in finding against the manifest weight of the evidence that Allstate was a bona fide purchaser of the subject real estate where Allstate did not obtain the mortgage in good faith. He argues that Allstate loaned money to Westfield at an exorbitant rate and therefore could not be a bona fide purchaser. We find this assignment of error is not well taken.

R.C. 5301.25(A) provides:

"(A) All deeds * * * and instruments of writing properly executed for the conveyance or encumbrance of lands, tenements, or hereditaments, * * * shall be recorded in the office of the county recorder of the county in which the premises are situated, and until so recorded or filed for record, they are fraudulent, so far as relates to a subsequent bona fide purchaser having, at the time of purchase, no knowledge of the existence of such former deed or land contract or instrument."

A bona fide purchaser is one who pays valuable consideration, has no notice of outstanding rights of others and acts in good faith. Black's Law Dictionary (5 Ed.Rev.1979) 161; see, also, *Shaker Corlett Land Co. v. Cleveland*

(1942), 139 Ohio St. 536, 23 O.O. 27, 41 N.E.2d 243, paragraph three of the syllabus.

McInnis contends that the cash advances that Allstate made to Westfield were disproportionately small compared with the value of receivables purchased. He claims the disparity is so severe as to constitute bad faith. In support of this claim, he states that Allstate earned interest at an effective rate of one hundred twenty percent per year, well over the ten percent stated by the legislature in R.C. 1343.03 (subsequently renumbered 1343.03[A]) and the prime rate which at the time was nine to thirteen percent.

The record reveals that Allstate was not and did not consider itself a lender. Allstate makes advances to high-risk borrowers, who might not otherwise be able to obtain funds. In return for the advances, the borrower assigns its receivables to Allstate to collect. Allstate assumes the underwriting and verification process and assumes the risk of uncollectibility. In return, it charges a fee based upon a percentage of the receivables which is not in the nature of interest. It treated Westfield no differently than the other clients it services. Westfield needed funds and assented to the transaction. There is no statutory or case law interpreting this type of financing arrangement as unfair or usurious. There was competent, credible evidence from which the trial court could determine that Allstate acted in good faith. Therefore, we cannot reverse the decision of the trial court as being against the manifest weight of the evidence. *C.E. Morris, supra; Seasons Coal, supra.* Accordingly, McInnis's fourth assignment of error is overruled.

In his fifth assignment of error, McInnis states that the trial court erred in finding against the manifest weight of the evidence that Allstate's mortgage had priority over his equitable vendee's lien. He argues that, as a purchaser of real estate under an executory contract, he had an equitable vendee's lien in the property in the amount of any purchase money paid which takes priority over Allstate's mortgage. We find this assignment of error is not well taken.

In support of his argument, McInnis cites *Wayne Bldg. & Loan Co. v. Yarborough* (1967), 11 Ohio St.2d 195, 40 O.O.2d 182, 228 N.E.2d 841, which states that " * * * the vendee under an executory contract for the sale and purchase of real property has an equitable lien or estate in the land in the amount paid on the purchase price." *Id.* at 199, 40 O.O.2d at 185, 228 N.E.2d at 845. However, this case also states:

"The vendee's equitable lien for payments made under an executory contract to purchase real estate is prior to the lien of a recorded mortgage, taken by the mortgagee *with notice of the vendee's contract of purchase,* to the extent that such payments are made before the vendee receives actual notice

of the mortgage." (Emphasis added; citation omitted.) *Id.* at paragraph one of the syllabus.

There was competent, credible evidence from which the trial court could conclude that Allstate had no notice of McInnis' purchase and sale agreement on the Emily Jones property. The evidence shows that Allstate did not have notice until August 26, 1985 when it received the mailgram from McInnis. Any advances after that date were properly deducted from the total amount secured by the mortgage. But for advances before that date, the evidence supports the trial court's finding that Allstate was a bona fide purchaser. "[A]n equitable estate in lands continues until cut off by the rights of a bona fide purchaser * * *." *Yarborough,* 11 Ohio St.2d at 200, 40 O.O.2d at 185, 228 N.E.2d at 846. Accordingly, McInnis' fifth assignment of error is overruled.

■ In his sixth assignment of error, McInnis states that the trial court erred in finding that $127,600 in funds seized by the IRS from the state of Ohio should satisfy only those amounts owed Allstate for which McInnis was not responsible. He argues that the trial court should have made a more equitable application of the $127,600. We find this assignment of error is not well taken.

The trial court began its analysis by determining the amount of the debt secured by the mortgage. It started with the stipulation by the parties that the approximate amount secured would be $183,227 less any amounts which it found to be inappropriate under the facts and law of this case. It then deducted $5,500 deficiency interest as inappropriate and a penalty in the amount of $24,173.16 because it was not provided for in the agreement between Allstate and Westfield. It then deducted $82,040 for advances made after August 26, 1985, the date on which Allstate had notice of McInnis' interest in the real estate. The deductions totaled $111,714.79, leaving a balance of $71,513, which was the amount secured by the mortgage and not the total amount due Allstate from Westfield.

The trial court then concluded that Allstate was entitled to judgment against Westfield in the sum of $153,553, the full amount of all unrepaid advances made by Allstate before and after August 26, 1985. The $127,600 that Allstate received from ODMRDD was deducted from the total amount due Allstate from Westfield. The court found the total unpaid judgment against Westfield was $25,953 and that this amount was secured by the mortgage.

It was within the discretion of the trial court to deduct the $127,600 Allstate received from ODMRDD from the total amount due Allstate from Westfield. There was no provision in either the factoring agreement or the second

mortgage deed requiring that any payment Allstate received had to be deducted from the amount secured by the mortgage. The action of the trial court was reasonable under the circumstances, especially considering that the amount of the judgment against Westfield falls well below the amount secured by the mortgage. We do not find its actions to be so arbitrary and unreasonable so as to connote an abuse of discretion. Accordingly, McInnis' sixth assignment of error is overruled.

In his seventh assignment of error, McInnis states that the trial court erred in failing to decide upon the merits of McInnis' equitable argument that a creditor must seek to satisfy his debt from other existing funds. He argues that the court should have ordered Allstate to satisfy its claim from other existing collateral that secures the same debt as is secured by the Emily Jones property. We find this assignment of error is not well taken.

The trial court failed to grant McInnis' request that any foreclosure be stayed pending a recovery from other collateral. Basically, he requested that the assets be marshaled and Allstate be required to foreclose on a mortgage it held on two parcels of property owned by Ronald Pallisco in Massachusetts that secured Westfield's debt to Allstate.

"[T]he doctrine of marshaling is a familiar one in equity, growing out of the equitable principle that a party having two funds to satisfy his demands shall not, by his election, disappoint a party who has only one of the funds upon which to rely, thus preventing him from exercising his right of recourse against the property or assets in question in an unreasonable manner or so as to satisfy his claim to the exclusion of such other claimants." *Homan v. Michles* (1963), 118 Ohio App. 289, 290–291, 25 O.O.2d 129, 129–130, 194 N.E.2d 162, 164; see, also, *Union Central Life Ins. Co. v. Cherry* (1931), 39 Ohio App. 298, 299, 177 N.E. 486.

There is, however, an exception to the application of this doctrine:

"In order that the doctrine may be applicable, the rule is that the parties must be creditors of the same debtor, and there can ordinarily be no marshaling of assets if the two funds to which creditors may resort are not derived from a common source or are not in the hands of a common debtor." *Homan*, 118 Ohio App. at 291, 25 O.O.2d at 130, 194 N.E.2d at 164.

McInnis suggests that he and Allstate are both creditors of Westfield and that there are several funds belonging to, Westfield out of which payment can be made. If McInnis has a lien against Westfield, it is upon any assets Westfield might own. However, Westfield does not own either the Emily Jones property or the Pallisco property. McInnis is the title owner of the Emily Jones property, the very property upon which he claims a lien. Pallisco

owns the Massachusetts property. Allstate may hold a mortgage on both properties but the two funds are not derived from a common source and are not in the hands of a common debtor. Therefore the doctrine of marshaling assets is inapplicable in this case.

■ Further, in order to be entitled to have the assets marshaled, McInnis must have a valid lien.

"An unsecured creditor cannot assert the equity to marshal assets. Apart from the debtor, only he who has secured a lien on a part of the assets, or a right in the nature of a lien, can exact the court's protection by marshaling." *Reconstruction Finance Corp. v. Howell Motor Co.* (1934), 16 Ohio Law Abs. 109, 113.

McInnis claims to be a creditor of Westfield by virtue of a judgment obtained against it for unpaid rents in the amount of $140,205. However, no judgment can become a valid lien on property unless a certificate of judgment is entered of record in the county in which the property is located. R.C. 2329.02. McInnis did not introduce a certificate of judgment at trial. Instead, he attached to his post-trial brief an entry of judgment against Westfield which was filed in Franklin County. There was no evidence at all that this entry was filed in Warren County. Thus, even if it were possible for McInnis to be a creditor of his own property, he has no valid lien since it is situated in Warren County. He is not entitled to assert the doctrine of marshaling assets.

Additionally, since both parties had rested, it was within the discretion of the trial court to consider this evidence which was attached to a brief after trial. *Ketcham v. Miller* (1922), 104 Ohio St. 372, 136 N.E. 145, paragraph three of the syllabus. Accordingly, McInnis's seventh assignment of error is overruled.

■ In his eighth assignment of error, McInnis states that the trial court erred in permitting Allstate to maintain this action when Allstate was not licensed to do business in Ohio. He argues that Allstate was conducting business in Ohio and was required to obtain a license under R.C. 1703.03. We find this assignment of error is not well taken.

R.C. 1703.03 provides:

"No foreign corporation not excepted from sections 1703.01 to 1703.31, inclusive, of the Revised Code, shall transact business in this state unless it holds an unexpired and uncanceled license to do so issued by the secretary of state. * * *"

R.C. 1703.29(A) further provides:

"The failure of any corporation to obtain a license under sections 1703.01 to 1703.31, inclusive, of the Revised Code, does not affect the validity of any contract with such corporation, but no foreign corporation which should have obtained such license shall maintain any action in any court until it has obtained such license. * * * "

Allstate admits that it is a foreign corporation incorporated under the laws of the state of Virginia. However, it maintains that it did not transact business within the state of Ohio and, even if it did, it was exempt from the licensing requirement under the interstate commerce exception.

Allstate did advance money to Westfield and several other corporations outside Ohio under the factoring agreement. However, the factoring agreement provides that all transactions were governed by the laws of Virginia. The issue of whether a foreign corporation is transacting business in Ohio or is engaging in interstate commerce is a factual determination. *Golden Dawn Foods v. Cekuta* (1964), 1 Ohio App.2d 464, 30 O.O.2d 452, 205 N.E.2d 121. Without findings of fact and conclusions of law on the issue of whether Allstate was transacting business in Ohio, we must presume regularity on the part of the trial court. *Brescoll, supra.*

Additionally, McInnis failed to introduce any evidence on this issue until after trial was concluded. It is within the discretion of the trial court to permit either party to introduce evidence after both sides have rested. *Ketcham, supra.* Any defense raised as to Allstate's failure to obtain a license was waived by failure to introduce evidence at trial. Accordingly, McInnis' eighth assignment of error is overruled.

The assignments of error properly before this court having been ruled upon as heretofore set forth, it is the order of this court that the judgment or final order herein appealed from be, and the same hereby is, affirmed.

*Judgment affirmed.*

YOUNG, P.J., HENDRICKSON and KOEHLER, JJ., concur.