[Cite as *In re C.B.C.*, 2016-Ohio-916.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
LAWRENCE COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF: | : | **RELEASED: 3/4/2016** |
| | : | |
| C.B.C. | : | Case Nos. 15CA18 |
| | : | 15CA19 |
| | : | |
| ADJUDICATED NEGLECTED | : | DECISION AND |
| AND DEPENDENT CHILD. | : | JUDGMENT ENTRY |

_____
APPEARANCES:

Philip Heald, Ironton, Ohio, for Appellant, MD.

Brian Cremeans, Ironton, Ohio, for Appellant, J.D.C.

Kevin Waldo, Ironton, Ohio, for Appellee.
_____
Harsha, J.

{¶1}   In this consolidated appeal M.D. (the child's mother) and J.D.C. (the child's father) contest the trial court's judgment awarding Lawrence County Children Services (LCCS) permanent custody of their twelve-year-old child, C.B.C.

{¶2}   The parents both assert that the trial court's judgment is against the manifest weight of the evidence because LCCS failed to clearly and convincingly prove that C.B.C. could not be placed with either parent within a reasonable time or should not be placed with either one, and that permanent custody is in C.B.C.'s best interest. Because the trial court found that the mother abandoned her child, the evidence clearly and convincingly shows that C.B.C. could not be placed with her within a reasonable time or should not be placed with her.  The father is serving a five-year prison term with a scheduled release date in December 2017.  Thus the father will not be available to provide care for C.B.C. until his release from prison in December 2017.  His hope for

early release is purely speculative. And by the time he is released in December 2017, the father will have been in prison six and one-half of C.B.C.'s fifteen years of life. The father's inability to lead a law-abiding life limits his availability to care for his child. Consequently, clear and convincing evidence supports the trial court's finding that C.B.C. cannot be placed with the father within a reasonable period of time or should not be placed with him. The parents' arguments that the evidence fails to support the trial court's finding on this issue are meritless.

{¶3} Likewise, clear and convincing evidence supports the court's finding that awarding LCCS permanent custody is in C.B.C.'s best interest. C.B.C. does not have a positive relationship with the mother, who abandoned him and showed no interest in even visiting with him since LCCS removed him from the home. Until permanent custody became a reality, C.B.C. consistently stated that he did not want to live with his mother. Although C.B.C. shares a positive relationship with his father, the father remains incarcerated, thus limiting any physical interaction with C.B.C. Starting in 2009, C.B.C. lived with relatives under a safety plan, and upon the father's 2010 release from prison, C.B.C. lived with him and sometimes the mother, until the father's return to prison in December 2012. From December 2012 through the date of removal, C.B.C. lived with the mother, who provided abysmal care. Thus C.B.C. has not had a stable custodial history. Moreover, C.B.C. needs a legally secure permanent placement. The mother has demonstrated that she will not provide the child with a legally secure permanent placement. The father claims he wants to provide C.B.C. with a legally secure permanent placement, but his failure to lead a law-abiding life indicates otherwise. No other suitable legally secure permanent placement is available.

Consequently, clear and convincing evidence supports the trial court's finding that awarding LCCS permanent custody is in C.B.C.'s best interest.

{¶4}  Both parents also argue that LCCS failed to use reasonable efforts to reunify them with their child.  The mother claims that LCCS did not afford her a reasonable amount of time to work towards reunification.  LCCS offered the mother a case plan aimed at reunification and attempted to contact her, but she failed to communicate with LCCS caseworkers, failed to visit C.B.C., and failed to make any attempt whatsoever to comply with the case plan. The failure here lies with the mother, not the agency. The father asserts that LCCS failed to use any efforts to reunify him with C.B.C.  However, the father was incarcerated throughout the proceedings and would continue to be incarcerated for at least eighteen months beyond the date of the permanent custody hearing.  Thus, reunification efforts would not have been reasonable given the father's circumstances.  The father did not have a home for C.B.C., and LCCS could have undertaken no effort—reasonable or otherwise—that would have removed this obstacle.  Therefore, the parents' assertions that LCCS failed to use reasonable efforts are meritless.

{¶5}  The father also argues that LCCS failed to offer him a case plan and to properly file a case plan, and that neither he nor his attorney agreed to a case plan. However, the father never objected to the case plan that was incorporated into the court's dispositional order.  And in fact, the trial court found that his attorney agreed to the case plan.  Therefore, the father forfeited the opportunity to raise alleged case plan deficiencies on appeal.

{¶6}    We overrule the parents' assignments of error and affirm the trial court's judgment.

## I. FACTS

{¶7}    After LCCS received a report that C.B.C. had not seen his mother for ten days and that he had been staying at a friend's house, LCCS sought and obtained emergency custody of him.  LCCS subsequently filed a complaint alleging C.B.C. to be neglected and dependent, and requested temporary custody over him.  LCCS alleged that (1) C.B.C. "has a long history of truancy," (2) "the child's mother has a long history of involvement with [LCCS] as well as a drug addiction," (3) the child was not properly supervised in his mother's home, and (4) the child did not have food in the home.

## A. Adjudicatory Hearing

{¶8}    At the February 10, 2015 adjudicatory hearing, the mother failed to appear.  LCCS caseworker Dave Carey stated that in late November 2014, he learned that C.B.C. "had not seen his mother in ten days and that he had been kicked out of the place he had been staying."  Carey later spoke with the child who informed him that he saw his mother shooting illegal drugs into her arm, and that his mother and her boyfriend smoke marijuana.  The child further explained that the mother and her friends "keep him up all night partying and he has trouble even getting up to go to school the next day."  C.B.C. advised Carey that "there was never any food in the home and that when he complains [his mother] would just go to the gas station and buy herself a 2-liter of pop and a bag of chips, and would not get him anything."  Carey further stated that LCCS has "dealt with [the mother] for years in drug addiction and truancy has always been an issue in that home."  Carey explained that LCCS has received "all sorts of drug

allegation against" the mother and "has had an involvement of a long history with the mother * * * over the timeframe that C.B.C. has been alive." Carey testified that the mother's problems caused the child to have problems getting to school on time, which led to a significant amount of truancy and negatively impacted his educational growth. Carey explained that C.B.C. was two years behind in school, but due to his age, the school has him one year behind. Carey stated that the mother "was more interested in whatever drugs she was using [on] a daily basis" and "did not feel it necessary to make sure [the child] was fed" or that "he went to school." Carey explained that during the ten-days C.B.C. had not seen his mother, he stayed at a friend's house. Cary testified that since December 1, 2014, he went to the mother's residence which is across the street from LCCS's offices approximately six times, but he was unable to make any contact with her. Carey stated that the father is incarcerated at present and will continue to be incarcerated for another year and one-half to two years and, thus, LCCS was unable to place C.B.C. with his father.

{¶9} Shawn Bailey testified that during the ten days when C.B.C. had not seen his mother, the child stayed at the house Bailey shared with his fiancée, Tonya Moore, and Tonya's son, who is close in age to C.B.C. Bailey explained that C.B.C. stayed with them on past occasions as well. Bailey testified that he and Moore are willing to continue caring for C.B.C.

{¶10} After hearing the evidence the court found C.B.C. to be neglected and dependent and stated, "All prior orders shall remain in effect." The only prior explicit custody order was the shelter care order continuing C.B.C. in LCCS's temporary custody and finding that LCCS used reasonable efforts. Thus, we presume that the

court intended to continue the child in LCCS's temporary custody following its adjudication.  However, we advise against the use of this language and caution trial courts to clearly state the result intended so that we are not left to ascertain its decision by referring to other documents in the record.

### B. Dispositional Hearing

{¶11}  At the March 3, 2015 dispositional hearing, the mother again failed to appear.  Her attorney stated that his communication attempts with the mother had been unsuccessful.  LCCS's attorney advised the court that it had been unsuccessful in obtaining the mother's agreement to a case plan.  LCCS did not "believe that she will even participate or maker [sic] herself available to sign the document that we propose is the reunification plan."  LCCS informed the court that it would be seeking permanent custody.  The court rescheduled the dispositional hearing for March 19, 2015.

{¶12}  Once again, the mother failed to appear for the March 19, 2015 hearing, which the court rescheduled for April 9, 2015.

{¶13}  The mother did not appear for the April 9, 2015 hearing.  The court nonetheless found that LCCS filed a reunification case plan for the mother, accepted it, and adopted it as its dispositional order.  The court also found "that the Attorneys for the parents agree on behalf of their clients that the reunification plan should be adopted by the Court as the dispositional order."  The court additionally noted that the guardian ad litem objected to the reunification plan and had filed a permanent custody motion. The case plan that the court incorporated as its dispositional order stated that LCCS has temporary custody of C.B.C. and that the goal was to reunify him with the mother. The case plan did not include any provisions regarding the father.

{¶14} Although the April 9, 2015 hearing ostensibly was a dispositional hearing, the record does not contain a transcript of this hearing. Moreover, the court's April 10, 2015 "dispositional" order did not explicitly choose among the R.C. 2151.353(A) dispositional alternatives, i.e., protective supervision, temporary custody, legal custody, permanent custody, planned permanent living arrangement. Instead, the court adopted LCCS's case plan as its dispositional order and reiterated, "All prior orders shall remain in effect." We again presume that the court meant to continue C.B.C. in LCCS's temporary custody. We repeat that a trial court should clearly state its orders so that the parties and reviewing courts can readily ascertain the court's decision without needing to examine other documents in the record. Additionally, we point out that adopting a case plan is not one of the dispositional alternatives outlined in R.C. 2151.353(A), but R.C. 2151.353(E) does require a trial court to adopt a case plan as part of its dispositional order. Nevertheless, because none of the parties addressed these issues, we do not find it necessary to dwell on them. As the Ohio Supreme Court recently noted:

> We "should be hesitant to decide such matters for the reason that justice is far better served when it has the benefit of briefing, arguing, and lower court consideration before making a final determination." *Sizemore v. Smith*, 6 Ohio St.3d 330, 332, 453 N.E.2d 632 (1983), fn. 2. To echo the Quarterman court, "[w]e are not obligated to search the record or formulate legal arguments on behalf of the parties, because '"appellate courts do not sit as self-directed boards of legal inquiry and research, but [preside] essentially as arbiters of legal questions presented and argued by the parties before them."'" Quarterman, ¶19, quoting *State v. Bodyke*, 126 Ohio St.3d 266, 2010-Ohio-2424, 933 N.E.2d 753, ¶ 78 (O'Donnell, J., concurring in part and dissenting in part), quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C.Cir.1983).

*Risner v. Ohio Dept. of Nat. Resources, Ohio Div. of Wildlife*, 144 Ohio St.3d 278, 2015-Ohio-3731, 42 N.E.3d 718, ¶28.

C. PERMANENT CUSTODY PROCEEDINGS

**{¶15}** The guardian ad litem filed a motion requesting that the court award LCCS permanent custody of C.B.C. under R.C. 2151.414(B)(1)(b), or alternatively, R.C. 2151.414(B)(2). The guardian ad litem alleged that in February 2013, the father was convicted of burglary and sentenced to five years in prison. She further alleged that the mother has abandoned C.B.C. and has not made any effort to work with LCCS or to visit the child. After appointing separate counsel for C.B.C., the court ultimately set the guardian's motion for a hearing on July 22, 2015.

**{¶16}** At the start of the permanent custody hearing, LCCS advised the court that it agreed with the guardian's permanent custody motion and "wishe[d] to proceed jointly on the prosecution of that motion."

1. Educator's testimony

**{¶17}** C.B.C.'s educators testified to his poor school attendance record. Kristen Hunt, his third grade teacher during the 2012-2013 school year, stated that the child missed 84 days out of approximately 175 and was tardy twelve times. During the first nine weeks of the second year, when C.B.C. was repeating third grade, he missed thirty days of school. She stated that his "poor attendance" "led to issues with his education, getting behind in certain areas because he wasn't here." Hunt explained that when C.B.C. arrived tardy and missed breakfast, he would ask whether he could still have something to eat. She further testified that C.B.C. often asked if he could see the nurse so that he could obtain clean clothing.

**{¶18}** Hunt also stated that the parents did not have any involvement in C.B.C.'s education—they did not attend parent-teacher conferences nor did they respond to the

vast majority of letters or phone calls. Hunt explained that the mother questioned whether the child needed an Individualized Education Plan, but the school indicated that C.B.C.'s "failing grades weren't due to his education and his ability[;] it was due to his not being in school and missing curriculum." Hunt testified that C.B.C.'s attendance record did not improve, even after school officials discussed the issue with the mother.

{¶19} Robert Rowe, the school guidance counselor, stated that C.B.C. started attending the school in 2008 and poor attendance was a consistent problem. Rowe stated that during the 2009-2010 school year, his attendance improved. Later testimony shows that C.B.C. was living with relatives during this time period.

2. Agency employee testimony

{¶20} LCCS caseworker Whitney Reynolds stated she met with the mother in April 2015 and discussed the case plan and what was expected of her. Reynolds informed the mother that she needed to go to a certified mental health or alcohol and drug abuse counseling center, undergo an assessment, and follow any treatment recommendations. Reynolds set up an appointment and sent the mother a letter advising her of the time. When Reynolds spoke with the mother by phone, she acknowledged that she had received the letter. Reynolds testified that the mother did not, however, attend the appointment. Reynolds explained that she requested drug screens, but the mother did not complete one until the Friday before the permanent custody hearing. Reynolds stated that this drug screen revealed the presence of marijuana and suboxone. Reynolds testified that the father was incarcerated, and LCCS "won't do a case plan with someone incarcerated because they can't work towards it." Reynolds stated that she does not believe that C.B.C. can be placed with

either parent within a reasonable time.  She explained that the mother "has not done anything toward the case plan and [the father] is incarcerated."

**{¶21}** Reynolds stated that C.B.C. informed her that he does not want to live with his mother, but he would like to be with his father.  Reynolds noted:  "He was not happy at [his mother]'s.  He said there were times that he didn't get to eat.  He would have to go to his grandmother's to eat.  They argued all the time."  Reynolds also testified that C.B.C. indicated he would like to live with his friend's mother, Tonya Moore, until his father's release from prison.  Reynolds stated that C.B.C. has a positive relationship with Moore and her son and has continued visiting them while in LCCS's temporary custody.  Reynolds further explained that since being placed in LCCS's temporary custody, C.B.C. has consistently attended school and his grades have improved.

**{¶22}** LCCS social services supervisor Teneka Ferguson testified that the agency has "a long history with the family" revolving around the mother's drug use and the child's truancy.  The first referral involving the mother occurred in July 2002, when she was pregnant with C.B.C.  During Ferguson's tenure at LCCS, in September 2009, the agency implemented a safety plan.  C.B.C. lived with relatives for approximately one year as part of that plan, and during this time, his school attendance improved.  Upon the father's release from a Kentucky prison, C.B.C. lived with him.

**{¶23}** Ferguson testified that she obtained the father's prison release information from the Ohio Department of Corrections and Rehabilitation website, which indicated that his stated term expires on December 10, 2017 and that he is eligible for judicial release on December 10, 2016.  Ferguson explained that LCCS would be unable to

attempt reunification or engage in services such as housing assistance or job seeking until the father's release from prison.  Ferguson agreed that the father could complete some parts of a case plan while imprisoned, but the drug counseling in prison "will not verify the type of treatment" and will not provide certificates.  Ferguson stated that upon the father's release, LCCS would need to complete a home study of his chosen residence.  She explained that if the father chose to live with his mother, LCCS would not approve her home as a placement because his mother previously had children removed from her custody.

{¶24}  Ferguson stated that C.B.C. "idolizes" his father and he "constantly strives to find a way to get out of [the foster home] and to get closer to a way to get to [his father].  He constantly says to us and to the workers, is there a way that someone could keep me until my dad gets out of prison.  Is there a way for me to go to stay with this person until my dad gets out of prison?"  She explained that C.B.C. has had some problems in the foster home:  "[W]e just had an episode about two weeks ago where [the child] called [the caseworker] and was saying that he wanted moved and that the foster parent had pulled him by his hand to tell him to do something and [the caseworker] went out there along with the foster case manager * * * and it was not anything abusive, he grabbed hold of his hand to turn him around to face him so that he could tell him you know to go finish his chores or something like that. * * * * So he is constantly having turmoil, of I don't even wanna [sic] call it turmoil, it's just ups and downs every day * * * ."

{¶25}  Ferguson testified that C.B.C. "rarely talks about" his mother and when LCCS first filed the complaint, he did not even want to see her. However, Ferguson

explained that now C.B.C. would stay with his mother until his father's release from prison, if she would receive counseling and treatment.

{¶26} Ferguson indicated that awarding LCCS permanent custody is in C.B.C.'s best interest. She stated that a temporary custody arrangement pending the father's release from prison is not in his best interest. Ferguson explained: "[T]he longer that a child has to find, what they call now a forever home, or just have a stable home basically, the harder it is for that child to feel stable and have a feeling of security;" and "the longer period of time that a child does not know where they will be, what home they will have, if they're waiting on someone to be able to take care of them, then that adds to their own insecurity and just a feeling of instability." Ferguson additionally explained that LCCS is trying to find a permanent placement for C.B.C. within a two year timeframe: "[T]he regulations as the state for children's services are a two-year plan. So that two-year plan would run out before [the father's] possible early release date. That's what drives us is trying to find a permanency goal for this child within that two year frame so yes it would run out before he would be able to start working on a case plan."

### 3. Moore's testimony

{¶27} Tonya Moore testified that C.B.C. is one of her son's friends and frequently visited her home and stayed overnight when he lived with his mother. Since he was removed from his mother's custody, C.B.C. still visits but has not been allowed to stay overnight. LCCS's counsel asked her whether she has "a desire to get [the child] in [her] home and raise him?" She stated that she "would take [the child] in a heartbeat." Moore stated that she spoke with Reynolds and the guardian ad litem about

her desire and that she would consider pursuing obtaining custody "because he seems fairly happy at my house." Counsel asked if she would be interested in adopting C.B.C., and she stated that she "would really like to talk to [the child] about that and you know I would like to see what he would want." The court asked Moore if there was a reason why she had not filed a motion for custody, and she stated that she did not "have the financial means to obtain a lawyer to do so." The guardian ad litem asked Moore whether she had the financial means to support C.B.C. Moore stated that she does not have a job but receives child support and food stamps. She testified that she is trying to find work and her fiancé works.

### 4. Mother's testimony

**{¶28}** Mirabile dictu! The mother appeared and testified. She claimed that in the days before LCCS obtained emergency custody of C.B.C., she was aware that he went to stay at Moore's house and she called Moore's house to check on C.B.C. She denied allegations that she lacked food in the home and asserted that C.B.C. always had plenty to eat. The mother additionally stated that she was attempting to comply with the case plan, but she did not become aware of its requirements until April 2015. She stated that she suffers from depression and that she does not have a "good *** relationship" with caseworker Carey, which hindered her ability to comply with the case plan.

### 5. Father's testimony

**{¶29}** The father testified that the earliest date he could be released from prison is July 17, 2016. He explained that he previously served eighteen months in a Kentucky detention center and that when he was released in August 2010, C.B.C. lived with him. Around the end of 2012 or beginning of 2013, he went back to prison to serve a five

year term. The guardian ad litem asked the father why he believed that he would lead a law-abiding life following his release from prison. He explained: "[I]t's called live and learn. That I have. What makes me think that I'm not going to, my little man. I ain't * * * got a choice. No matter, no decisions that I make, my choices revolve around my kids. What I do [a]ffects them."

### 6. Court's decision

**{¶30}** The trial court awarded LCCS permanent custody of C.B.C. The court determined that C.B.C. cannot be placed with either parent within a reasonable time or should not be placed with either parent. The court noted that LCCS developed a plan to reunify C.B.C. with the mother and that LCCS used reasonable efforts concerning the mother, but found that further reunification attempts would not be in his best interest. The court determined that the mother "essentially abandoned the child after the initial shelter care hearing." The court noted that the mother did not visit the child and did not attend any scheduled court proceedings after the shelter care hearing, except for the July 2015 permanent custody hearing. The court also found that the mother failed to substantially comply with any aspect of the reunification plan and did not make "any viable effort toward compliance." The court observed that LCCS "has had a long history with the mother regarding this child's lack of supervision, truancy issues and the mother's substance abuse," yet the mother has not provided an adequate home for the child "and has failed continuously and repeatedly to remedy the conditions that ultimately caused the placement of the child outside the home on November 29, 2014."

**{¶31}** The court additionally observed that the father has been incarcerated for approximately four of the past six years and his scheduled release date is December

10, 2017. The court recognized that the father is eligible for early release; but nonetheless, the court found that C.B.C. cannot be placed with the father at the present time and cannot be placed with him within a reasonable period of time.

{¶32} The court also determined that the parents "have displayed a lack of commitment to the child's best interest since 2009 as evidenced by the child's excessively poor school attendance, the mother's failure to address depression and substance abuse issues, and the father's decisions regarding criminal behavior."

{¶33} The court next found that awarding LCCS permanent custody would be in C.B.C.'s best interest. Addressing C.B.C.'s interactions and interrelationships, the court noted that the child idolizes his father. The court found, however, that the father "has not had significant contact with the child for over 2 years and his earliest release on paper presented to the Court is nearly 17 months away. The father has not had opportunity to serve as custodial parent during his incarceration." The court also noted that when the father was not in prison and apparently had custody, C.B.C.'s school attendance continued to be poor—he "missed excessive days of school."

{¶34} The court additionally considered C.B.C.'s wish to live with his father and for a family friend to assume custody until his father's release from prison. The court found, however, that no one else had filed a motion requesting custody of the child.

{¶35} The court next considered C.B.C.'s need for a legally secure permanent placement and whether that type of placement can be achieved without granting LCCS permanent custody. The court found that neither parent can provide a stable, secure environment for him or the supervision necessary to protect his safety. The court thus determined that neither parent could provide C.B.C. with a legally secure permanent

placement. The court therefore determined that awarding LCCS permanent custody is in C.B.C.'s best interest and terminated the mother's and the father's parental rights.

II. ASSIGNMENTS OF ERROR

**{¶36}** The mother raises one assignment of error:

"THE TRIAL COURT GRANTING PERMANENT CUSTODY [SIC] TO THE LAWRENCE COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES, CHILDREN'S SERVICES DIVISION, WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AND WAS THEREFORE REVERSIBLE ERROR."

**{¶37}** The father raises two assignments of error:

First Assignment of Error:

"THE TRIAL COURT ERRED IN ORDERING PERMANENT CUSTODY TO THE LAWRENCE COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES, CHILDREN SERVICES DIVISION, AS SUCH WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

Second Assignment of Error:

"THE TRIAL COURT ERRED IN ORDERING PERMANENT CUSTODY TO THE LAWRENCE COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES, CHILDREN SERVICES DIVISION, WHERE THE APPELLANT WAS NOT OFFERED A REUNIFICATION PLAN AND THE TRIAL COURT ERRED WHEN IT STATED IN ITS JUDGMENT ENTRY THAT THE PARENT'S ATTORNEYS AND THE FATHER AGREED TO A REUNIFICATION PLAN RETURNING THE CHILD TO THE MOTHER'S CUSTODY, DESPITE THE RECORD BEING

DEVOID OF ANY REUNIFICATION PLAN BEING ADOPTED BY THE COURT OR APPROVED BY THE PARTIES."

### III.  ANALYSIS

**{¶38}**  The mother argues that the trial court's decision to award LCCS permanent custody is against the manifest weight of the evidence because the record fails to clearly and convincingly show that C.B.C. cannot be placed with either parent within a reasonable time or should not be placed with either parent.  Specifically, she focuses almost entirely on the court's decision that placement with the father was unwarranted. To the extent that the mother presents argument that raise the father's rights, we assume without deciding that she has standing to do so. *See In re A.M.*, 4th Dist. No. 08CA862, 2008-Ohio-4835, ¶1, fn.1. The mother also complains about the timing of the motion for permanent custody, which was filed only eight months after LCCS filed its initial request for emergency custody.

**{¶39}**  The father's two assignments of error overlap with the mother's. First, he challenges the court's findings that C.B.C. cannot be placed with either parent within a reasonable time or should not be placed with either one, and that permanent custody is in C.B.C.'s best interest. He contends neither finding is supported by clear and convincing evidence.  The father also argues that the trial court erred by granting LCCS permanent custody without first requiring LCCS to attempt reunifying him with C.B.C. or to offer him a case plan, i.e., that his imprisonment should not have served as an automatic barrier to case planning and reunification efforts.

### A.  FAILURE TO REQUEST FINDINGS OF FACT AND CONCLUSIONS OF LAW

{¶40} Although the trial court entered some findings of fact and conclusions of law, the trial court did not cite which specific statutory factors it relied upon to reach its decision, nor did it correlate its factual findings to the statutory factors. However, neither parent filed a request for findings of fact and conclusions of law. Civ.R. 52 states: "When questions of fact are tried by a court without a jury, judgment may be general for the prevailing party unless one of the parties in writing requests otherwise * * * in which case, the court shall state in writing the conclusions of fact found separately from the conclusions of law." Additionally, R.C. 2151.414(C) states: "If the court grants permanent custody of a child to a movant under this division, the court, upon the request of any party, shall file a written opinion setting forth its findings of fact and conclusions of law in relation to the proceeding." The failure to request findings of fact and conclusions of law ordinarily results in a forfeiture of the right to challenge the trial court's lack of an explicit finding concerning an issue. *In re Barnhart*, 4th Dist. Athens No. 02CA20, 2002–Ohio–6023, ¶23, and *Wangugi v. Wangugi*, 4th Dist. Ross No. 99CA2531, 2000 WL 377971 (Apr. 12, 2000). "'[W]hen a party does not request that the trial court make findings of fact and conclusions of law under Civ.R. 52, the reviewing court will presume that the trial court considered all the factors and all other relevant facts.'" *Id.*, quoting *Fallang v. Fallang*, 109 Ohio App.3d 543, 549, 672 N.E.2d 730 (12th Dist.1996).

{¶41} We have applied this rule to permanent custody cases and have held that unless a party requests findings of fact and conclusions of law, a trial court need not set forth specific factual findings regarding each R.C. 2151.414(D) best interest factor. *In re R.S.-G.*, 4th Dist. Athens No. 15CA2, 2015-Ohio-4245, ¶48; *In re N.S.N.*, 4th Dist.

Washington Nos. 15CA6, 15CA7, 15CA8, 15CA9, 2015-Ohio-2486, ¶¶36–37. We recently concluded that this same analysis applies to R.C. 2151.414(E). *In re C.S.*, 4th Dist. Athens No. 15CA18, 2015-Ohio-4883, ¶31. Thus, in the absence of a proper request for findings of fact and conclusions of law, the trial court was not required to set forth a specific analysis of the R.C. 2151.414(D) or (E) factors. *See also In re Burton*, 3rd Dist. Mercer No. 10–04–01, 2004–Ohio–4021, ¶¶22–23.

{¶42} Furthermore, in the absence of findings of fact and conclusions of law, we presume that the trial court applied the law correctly and affirm its judgment if evidence in the record supports its. *Bugg v. Fancher*, 4th Dist. Highland No. 06CA12, 2007–Ohio–2019, ¶10, citing *Allstate Fin. Corp. v. Westfield Serv. Mgt. Co.*, 62 Ohio App.3d 657, 577 N.E.2d 383 (12th Dist.1989); accord *Yocum v. Means*, 2nd Dist. Darke No. 1576, 2002–Ohio–3803, ¶7 ("The lack of findings obviously circumscribes our review * * *."). As the court explained in *Pettet v. Pettet*, 55 Ohio App.3d 128, 130, 562 N.E.2d 929 (5th Dist.1988):

> [W]hen separate facts are not requested by counsel and/or supplied by the court the challenger is not entitled to be elevated to a position superior to that he would have enjoyed had he made his request. Thus, if from an examination of the record as a whole in the trial court there is some evidence from which the court could have reached the ultimate conclusions of fact which are consistent with [its] judgment the appellate court is bound to affirm on the weight and sufficiency of the evidence. The message should be clear: If a party wishes to challenge the * * * judgment as being against the manifest weight of the evidence he had best secure separate findings of fact and conclusions of law. Otherwise his already "uphill" burden of demonstrating error becomes an almost insurmountable "mountain."

## B. PERMANENT CUSTODY PRINCIPLES

{¶43} Parents have a "fundamental liberty interest" in the care, custody, and management of their child and an "essential" and "basic civil right" to raise them.

*Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed .2d 599 (1982); *In re Murray*, 52 Ohio St.3d 155, 156, 556 N.E.2d 1169 (1990); *accord In re D.A.*, 113 Ohio St.3d 88, 2007–Ohio–1105, 862 N.E.2d 829. A parent's rights, however, are not absolute. *D.A.* at ¶11. Rather, "'it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the pole star or controlling principle to be observed.'" *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla.App.1974). Thus, the state may terminate parental rights when a child's best interest demands such termination. *D.A.* at ¶11.

### C. BURDEN OF PROOF & STANDARD OF REVIEW

**{¶44}** In a permanent custody case clear and convincing evidence must support the juvenile court's findings. *See In re K.H.*, 119 Ohio St.3d 538, 2008–Ohio–4825, 895 N.E.2d 809, ¶43; accord R .C. 2151.414(B)(1). "Clear and convincing evidence" is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St.469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *State ex rel. Miller v. Ohio State Hwy. Patrol*, 136 Ohio St.3d 350, 2013–Ohio–3720, 995 N.E.2d 1175, ¶14.

**{¶45}** The same standard of review applies to both appeals. "A reviewing court generally will not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence." *In re R.S.*, 4th Dist. Highland No. 13CA22, 2013–Ohio–5569, ¶29; accord *In re J.V.-M.P.*, 4th Dist. Washington No.

13CA37, 2014–Ohio–486, ¶11.  To determine whether a permanent custody decision is against the manifest weight of the evidence, an appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving evidentiary conflicts, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.  *R.S.* at ¶30, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d 517, ¶20.

{¶46}  In reviewing the evidence under this standard, we must defer to the trial court's credibility determinations because of the presumption in favor of the finder of fact.  Id. at ¶33, citing *Eastley* at ¶21.  Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well."  *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997); accord *In re Christian*, 4th Dist. Athens No. 04CA10, 2004–Ohio–3146, ¶7.  As the Ohio Supreme Court explained long-ago:  "In proceedings involving the custody and welfare of children the power of the trial court to exercise discretion is peculiarly important.  The knowledge obtained through contact with and observation of the parties and through independent investigation can not be conveyed to a reviewing court by printed record."  *Trickey v. Trickey*, 158 Ohio St. 9, 13, 106 N.E.2d 772 (1952).  Furthermore, unlike an ordinary civil proceeding in which a jury has no contact with the parties before a trial, in a permanent custody case a trial court judge may have significant contact with the parties before permanent custody is even requested.  *In re R.S.* at ¶34.  In such a situation it is reasonable to presume that the trial court judge had far more opportunities to evaluate the credibility,

demeanor, attitude, etc., of the parties than this court ever could from a mere reading of the permanent custody hearing transcript. Id.

**{¶47}** "[I]f the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M.*, 2013–Ohio–3588, 997 N.E.2d 169, ¶55 (4th Dist.). Thus, the essential question we must resolve when reviewing a permanent custody decision under the manifest weight of the evidence standard is whether the greater amount of competent, credible evidence presented at trial produced in the trier of fact's mind a firm belief or conviction that permanent custody was warranted. *In re J.H.,* 4th Dist. Hocking No. 14CA4, 2014-Ohio-3108, ¶14.

### D.  STATUTORY FRAMEWORK

**{¶48}** R.C. 2151.414(B)(1)(a) permits a trial court to grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence, that the child's best interest would be served by the award of permanent custody and that "[t]he child is not abandoned or orphaned * * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents."  Both parties challenge the trial court's finding that the child could not be placed with either parent within a reasonable time or should not be placed with either, and both also challenge its finding that permanent custody is in the child's best interest.

### 1. PLACEMENT WITH EITHER PARENT

{¶49} When a trial court considers whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with either parent, R.C. 2151.414(E) directs the court to "consider all relevant evidence." The statute further requires a court to make such a finding if clear and convincing evidence shows the existence of any one of the enumerated factors. Relevant here are R.C. 2151.414(E)(4), (10), (11), (12), (13), and (16). The statute states that a court "shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent" if:

> (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
> * * * *
> (10) The parent has abandoned the child.
> * * * *
> (12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.
> (13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child.
> * * * *
> (16) Any other factor the court considers relevant.

{¶50} A trial court may base its "cannot or should not" placement decision upon the existence of any one of the R.C. 2151.414(E) factors. The existence of one factor alone will support such a finding. *E.g., In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶50; *In re William S.*, 75 Ohio St.3d 95, 99, 661 N.E.2d 738 (1996).

{¶51} Here, clear and convincing evidence supports the trial court's cannot or should not findings. The mother has not had any contact with her child since LCCS obtained temporary custody, and she allowed several months to elapse before she

communicated with LCCS. And she rarely if ever appeared at court proceedings. Under R.C. 2151.011(C), she has abandoned her child. Thus, R.C. 2151.414(E)(10) applies. Moreover, she made no attempt to comply with the case plan, and she displayed an extreme lack of commitment to her child, so R.C. 2151.414(E)(4) also applies. The existence of either factor alone is enough to support the trial court's finding that C.B.C. cannot be placed with the mother within a reasonable time or should not be placed with her. Thus, the evidence clearly and convincingly supports the court's finding.

{¶52} Furthermore, clear and convincing evidence supports the trial court's finding that C.B.C. cannot be placed with the father within a reasonable time or should not be placed with him. The father declares his love for his child and desire to be reunified with him upon his release from prison. However, the father is scheduled to remain in prison until December 2017—more than two years beyond the date of the permanent custody hearing. At the time of the permanent custody hearing in July 2015, he therefore had well over eighteen months remaining on his stated prison term. Consequently, the evidence supports a finding under R.C. 2151.414(E)(12) that the father will be unavailable to care for C.B.C. for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing. This one finding alone supports the trial court's determination that C.B.C. cannot be placed with the father within a reasonable time or should not be placed with the father.

{¶53} The mother nonetheless claims that the record does not contain any documentary evidence regarding the father's prison sentence. To the contrary, LCCS caseworker Ferguson testified to the information she obtained from the Ohio Department of Rehabilitation and Corrections website, and the document she

referenced was introduced during the permanent custody hearing without objection. It plainly shows that the father's stated prison term expires on December 10, 2017, and that he "is statutorily eligible to be screened for suitability and a possible recommendation to the sentencing court for early release" on December 10, 2016.

**{¶54}** Any hopes the mother or father harbor of his earlier release are purely speculative; we have previously rejected speculative release dates as establishing that a parent will be available to care for a child within the eighteen-month timeframe set forth in R.C. 2151.414(E)(12). *In re M.M.*, 4th Dist. Meigs No. 14CA6, 2014-Ohio-5111, ¶32; *In re K.M.D.*, 4th Dist. Ross No. 11CA3289, 2012–Ohio–755, ¶26; *accord In re M.J.P.*, 3rd Dist. Mercer No. 10-12-11, 2013-Ohio-2148, ¶ 20 (noting that mother's claim she would be granted judicial release was purely speculative).

**{¶55}** And, even if the father is released from prison within the eighteen-month timeframe set forth in R.C. 2151.414(E)(12), the trial court nonetheless could have determined that R.C. 2151.414(E)(4) or (13) supported a finding that the child cannot be placed with the father within a reasonable time or should not be placed with him. The father had been imprisoned in Kentucky for eighteen months, was released sometime in the summer or latter part of 2010, and in late 2012, committed another criminal offense resulting in a five-year prison sentence. Thus, at the time of the permanent custody hearing, the father had served more than four of the preceding six years in prison. Although the father testified that he has learned his lesson and that upon his release from prison this time, he will lead a law-abiding life to be available to care for C.B.C., the trial court was entitled to discredit the father's testimony. We are a reviewing court not well-suited to assess the father's credibility; thus, we defer to the trial court on this

matter. *C.S.* at ¶37. Given his history, the trial court could have reasonably concluded that the father would be unlikely to lead a law-abiding life, which ultimately would leave him unavailable to care for his child. Under R.C. 2151.414(E)(13) the evidence thus supports a finding that the father's repeated imprisonment prevents him from providing proper care for C.B.C.

**{¶56}** Additionally, under R.C. 2151.414(E)(4) the father's choices to engage in criminal conduct show an unwillingness to provide an adequate permanent home for C.B.C. Although the father may be "committed" to C.B.C. in the sense that he loves the child and desires to have custody of him, the father's actions show that he has not acted in a manner consistent with providing C.B.C. with an adequate permanent home. Instead, if the father serves his total five-year prison sentence, he will have been in prison for more than six and one-half years of C.B.C.'s approximately fifteen-year life (the child will turn fifteen years of age in late December 2017). The father obviously cannot provide proper care for the child if he is imprisoned for almost half of C.B.C.'s young life. Although we are aware of the father's desire to have custody of his child, the father's own decisions to engage in criminal conduct are the primary reason why he is unable to fulfill that desire. Thus, the father—and sadly C.B.C.—must bear the consequences of his poor choices.

**{¶57}** Consequently, clear and convincing evidence supports the trial court's finding that C.B.C. cannot be placed with either parent within a reasonable time or should not be placed with either one.

2. BEST INTEREST

{¶58}  Both parents argue that the trial court's finding that awarding LCCS is in C.B.C.'s best interest is not supported by clear and convincing evidence.  The mother contends that severing the child's bond with the father is not in C.B.C.'s best interest. The father argues that the best interest factors weigh against a finding that awarding LCCS permanent custody is in C.B.C.'s best interest.  The father asserts that he and the child share a loving relationship, the child wishes to live with his father, the child's custodial history shows that he has primarily lived with the mother and/or the father, and the child had been in LCCS's temporary custody only since the end of November 2014. He further contends that the court failed to consider whether C.B.C. could receive a legally secure permanent placement without granting LCCS permanent custody.

{¶59}  "In a best-interests analysis under R.C. 2151.414(D), a court must consider 'all relevant factors,' including five enumerated statutory factors * * *.  No one element is given greater weight or heightened significance."  *C.F.* at ¶57, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006–Ohio–5513, 857 N.E.2d 532, ¶ 6. The five enumerated factors include: (1) the child's interaction and interrelationship with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's guardian ad litem, with due regard for the child's maturity; (3) the child's custodial history; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.

**{¶60}** Clear and convincing evidence supports the trial court's determination that awarding LCCS permanent custody is in C.B.C.'s best interest. Looking to the child's interactions and interrelationships, the evidence demonstrates that C.B.C. has a positive relationship with his father; C.B.C. clearly loves his father and shares a strong bond with him, despite the father's imprisonment. Unfortunately, the father's imprisonment has not allowed for much physical interaction with C.B.C. C.B.C. does not share a positive relationship with his mother, and the mother provided, at best, abysmal care for her child throughout the time he was in her custody. C.B.C. has an eighteen-year-old half-sister and has a positive relationship with her. C.B.C. also has a positive relationship with his friend and friend's mother, Tonya Moore. C.B.C. appears to have some struggles in his foster home, but those struggles seem to result from his desire to be reunified with his father. LCCS did not present any other evidence regarding his interactions and interrelationships in the foster home.

**{¶61}** Regarding C.B.C.'s wishes, the evidence clearly shows that he desires to live with his father upon his release from prison. However, the father is scheduled to remain in prison until December 2017—when C.B.C. is turning fifteen years of age. The best option for C.B.C. to thrive, as LCCS supervisor Ferguson testified, is not to live with the uncertainty and instability of a temporary custody arrangement pending his father's release, but instead, is to live with the certainty and stability of a permanent custody arrangement. Moreover, whether the father would choose to live a law-abiding life free from imprisonment following his release is an open question. No one can say with certainty whether the father would give the child the stability of a permanent home upon his release from prison. The court could have reasonably decided not to follow C.B.C.'s

wishes because it did not want to experiment with his welfare. As we have recognized time and again, a trial court is not required to experiment with a child's welfare in order to permit a parent to prove his or her suitability:

> " ' * * * [A] child should not have to endure the inevitable to its great detriment and harm in order to give the * * * [parent] an opportunity to prove her suitability. To anticipate the future, however, is at most, a difficult basis for a judicial determination. The child's present condition and environment is the subject for decision not the expected or anticipated behavior of unsuitability or unfitness of the * * * [parent]. * * * The law does not require the court to experiment with the child's welfare to see if he will suffer great detriment or harm.'"

*In re A.C.H.*, 4th Dist. Gallia No. 11CA2, 2011–Ohio–5595, ¶42, quoting *In re Bishop*, 36 Ohio App.3d 123, 126, 521 N.E.2d 838 (5th Dist.1987), quoting *In re East*, 32 Ohio Misc. 65, 69, 288 N.E.2d 343 (1972).

**{¶62}** Although C.B.C. obviously loves his father, we echo the sentiments expressed in *In re V.C.*, 8th Dist. Cuyahoga No. 102903, 2015-Ohio-4991, ¶55:

> "Every parental rights termination case involves a difficult balance between maintaining a natural parent-child relationship and protecting the best interests of a child. Although "[f]amily unity and blood relationship are vital factors to carefully and fully consider," the paramount consideration is always the best interest of the child. In re J.B., 2013–Ohio–1704, at ¶111, citing In re T.W., 8th Dist. Nos. 86084, 86109, and 86110, 2005–Ohio–6633, ¶15. "[A] child's best interests require permanency and a safe and secure environment." In re E.W., 8th Dist. Cuyahoga Nos. 100473 and 100474, 2014–Ohio–2534, ¶ 29. "To protect the child's interest," neither the existence of a biological relationship or a "good relationship" is controlling in and of itself. In re J.B., 8th Dist. Cuyahoga Nos. 98518 and 98519, 2013–Ohio–1706, ¶ 163, citing In re T.W. at ¶15."

**{¶63}** C.B.C.'s custodial situation has changed several times since 2009, when the mother entered into a safety plan with LCCS and agreed to place him with relatives. C.B.C. lived with these relatives until the latter part of 2010, when the father completed his eighteen-month Kentucky prison sentence. C.B.C. remained living with his father in various locations—and sometimes with the mother—until late 2012, when the father

committed another crime and went to prison again.    From 2012 until November 2014, C.B.C. lived with his mother.

{¶64}  C.B.C. needs a legally secure permanent placement.  The mother has shown that she is unwilling to provide it.  The father says he would like to provide it, but his criminal behavior prevents him from doing so.  Tonya Moore stated that she would agree to take custody of C.B.C., but it is unclear whether Moore would take custody on a permanent basis, or only on a temporary basis until the father's release from prison. The record does not indicate any other viable options for a legally secure permanent placement.

{¶65}  The father argues that the trial court's best interest finding is against the manifest weight of the evidence because the court failed to consider whether C.B.C. could receive a legally secure permanent placement without granting LCCS permanent custody.  The father asserts that "it is unclear from the entry whether the court considered if placement could be achieved without a grant of permanent custody."  As we indicated earlier, the father did not request findings of fact and conclusions of law, and the trial court did not, therefore, have a duty to enter a specific factual finding regarding this factor.  Moreover, we reviewed the record along with the trial court's decision and determined that clear and convincing evidence supports a finding that the child needs a legally secure permanent placement that cannot be achieved without granting LCCS permanent custody.

{¶66}  The mother and father argue that the trial court should have considered placing the child with Tonya Moore before it terminated their parental rights. However, a trial court need not find by clear and convincing evidence that terminating parental rights

is the only option or that no suitable person is available for placement. *Schaefer* at ¶64. Rather, once the court finds the existence of any one of the R.C. 2151.414(B)(1)(a)-(e) factors, R.C. 2151.414(D)(1) then requires the court to weigh "all the relevant factors * * * to find the best option for the child." *Id.* "The statute does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor. The statute does not even require the court to weigh that factor more heavily than other factors." *Id.* Moore did not file a motion seeking custody. And, in light of the absence of a request for findings of fact and conclusion of law, there is nothing in the record to indicate the court failed to consider placement with Tonya Moore. In fact, based upon her equivocal testimony about whether she wanted a permanent relationship with the child, the court could have reasonably concluded placement with her was not in the child's best interest. A child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security. *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324, 574 N.E.2d 1055 (1991). Therefore, courts are not required to favor relative or non-relative placement if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody. *Schaefer* at ¶64; accord *In re T.G.*, 4th Dist. Athens No. 15CA24, 2015-Ohio-5330, ¶24.

{¶67} We have previously indicated that a trial court need not "consider" relative placement before awarding a children services agency permanent custody. *See In re M.M.*, 4th Dist. Meigs No. 14CA6, 2014-Ohio-5111, ¶39; *In re J.H.*, 4th Dist. Hocking No. 14CA4, 2014-Ohoi-3108, ¶27; *In re C.T.L.A.,* 4th Dist. Hocking No. 13CA24, 2014-Ohio-1550, ¶52; accord *In re A.R.*, 4th Dist. Highland No. 14CA10, 2014-Ohio-4916, ¶21. However, it is more accurate to state that a court need not find that a child cannot

be placed with a relative or non-relative, rather than stating that a court need not "consider" it. When deciding permanent custody motions, trial courts must weigh—and hence, "consider"—all relevant factors, which may include relative or non-relative placement, to determine what placement option is in the child's best interest. *In re A.C.H.* at ¶44.

{¶68} We also note that the guardian ad litem recommended that the court award LCCS permanent custody of the child, and her report indicates that the child "has made great strides educationally" since being placed in LCCS's temporary custody. The guardian ad litem stated that the child has been promoted a grade level and improved his grades from failing to Bs.

{¶69} Although both parents refer to R.C. 2151.414(D)(2) in their appellate briefs, the child has not been in LCCS's temporary custody for two years or longer, and thus, R.C. 2151.414(D)(2) has no applicability here.

{¶70} Accordingly, a balancing of all of the relevant factors clearly and convincingly supports the trial court's best interest finding.

### 3. REASONABLE EFFORTS

{¶71} Both parents argue that the trial court erred by awarding LCCS permanent custody because LCCS failed to use reasonable efforts to reunify the family. The mother contends that she was not afforded a sufficient opportunity to fulfill her case plan goals. She argues that the guardian ad litem filed the permanent custody motion after only four months had elapsed since LCCS obtained temporary custody and that LCCS, by later joining the guardian ad litem's motion, did not seriously pursue reunification

efforts. The father asserts he was never offered a case plan or an opportunity to reunify with the child.

a. R.C. 2151.419(A)

{¶72} R.C. 2151.419(A)(1) requires a trial court to determine whether a children services agency "made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." However, this statute applies only at "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children." *C.F.* at ¶41. Thus, "'[b]y its plain terms, the statute does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414." *Id.* But, "[t]his does not mean that the agency is relieved of the duty to make reasonable efforts" before seeking permanent custody. *Id.* at ¶42. Instead, at prior "stages of the child-custody proceeding, the agency may be required under other statutes to prove that it has made reasonable efforts toward family reunification." *Id.* And "[if] the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.* at ¶43.

{¶73} The parents' appeals do not originate from one of the types of hearings specifically referenced in R.C. 2151.419(A): "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children." *C.F.*, *supra.* Therefore, LCCS was not required to prove at the

permanent custody hearing that it used reasonable efforts to reunify the family, unless LCCS had not previously done so. *C.F.*, *supra*.

**{¶74}** Here, the trial court made two reasonable efforts findings. The first finding appears in the court's decision continuing the child in LCCS's temporary custody following the shelter care hearing. The court did not enter another reasonable efforts finding until it made one concerning the mother in its permanent custody decision. Although the court should have made a reasonable efforts determination when it issued both its adjudication and its disposition order, it did not. See R.C. 2151.419(A) (requiring reasonable efforts to be shown at adjudication and disposition hearings). Neither party, however, objected to the court's failure to determine whether LCCS used reasonable efforts when it entered its adjudication and disposition orders. Moreover, neither party raises that issue on appeal. Thus, we will only review the reasonable efforts finding from the permanent custody hearing.

<h4 style="text-align:center">b. STANDARD OF REVIEW AND BURDEN OF PROOF</h4>

**{¶75}** The parties appear to agree that we review the trial court's reasonable efforts finding using the same manifest weight of the evidence standard that we apply when reviewing its permanent custody decision. They further appear to agree that LCCS bore the burden of proving reasonable efforts by clear and convincing evidence. Because the parties have not argued that a different burden of proof applies or that we apply a different standard of review, we apply these rules here. *See Risner, supra*, at ¶28.

<h3 style="text-align:center">C. MEANING OF REASONABLE EFFORTS</h3>

**{¶76}** In general, "reasonable efforts" mean "'[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed.'" *C.F.* at ¶28, quoting Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation*, 12 B.U.Pub.Int.L.J. 259, 260 (2003). "'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.'" *In re H.M.K.,* 3d Dist. Wyandot Nos. 16–12–15 and 16–12–16, 2013–Ohio–4317, ¶ 95, quoting *In re D.A.,* 6th Dist. Lucas No. L–11–1197, 2012–Ohio–1104, ¶ 30. In other words, the agency must use reasonable efforts to help remove the obstacles preventing family reunification. Bean, *Reasonable Efforts: What State Courts Think*, 36 U. Tol. L. Rev. 321, 366 (2005), quoting *In re Child of E.V.*, 634 N.W.2d 443, 447 (Minn. Ct. App. 2001), and *In re K.L.P.*, No. C1-99-1235, 2000 WL 343203, at *5 (Minn. Ct. App. Apr. 4, 2000) (explaining that the agency must address what is "necessary to correct the conditions that led to the out-of-home placement" and must "provide those services that would assist in alleviating the conditions leading to the determination of dependency"). However, "'[r]easonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." *In re Lewis*, 4th Dist. Athens No. 03CA12, 2003-Ohio-5262, ¶16. Furthermore, the meaning of "reasonable efforts" "will obviously vary with the circumstances of each individual case." *Suter v. Artist M.*, 503 U.S. 347, 360, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). Additionally, "[i]n determining whether reasonable efforts were made, the child's health and safety shall be paramount." R.C. 2151.419(A)(1).

### d. Mother

{¶77} The mother's drug addiction and utter lack of commitment to the child were the primary obstacles preventing reunification with the child. The trial court specifically stated in its entry granting LCCS permanent custody that LCCS used reasonable efforts to reunify the child with the mother; the evidence supports the court's finding. LCCS caseworkers attempted to communicate with the mother, but she was unresponsive. The mother made no attempt to comply with the case plan, and she did not even visit with the child after LCCS obtained temporary custody. Before the permanent custody hearing, LCCS caseworker Reynolds set up an appointment for the mother, but the mother failed to follow through with the appointment. Only the Friday before the permanent custody hearing did the mother submit to a drug screen, and it was positive. Thus, even though the mother may be correct that the guardian ad litem filed a permanent custody motion approximately four months after LCCS obtained permanent custody, the mother is incorrect in her belief that LCCS ceased its efforts to help the mother fulfill the case plan goals in order to achieve reunification with the child. Despite LCCS's efforts to work with the mother, the mother failed to work with LCCS. Thus, it was not a lack of reasonable efforts on the part of LCCS, but a lack of *any* efforts on the mother's part. Consequently, we find no merit to the mother's argument that LCCS did not use reasonable efforts to reunify her with the child. *See In re Billingsley*, 3rd Dist. Putnam No. 12-02-07, 2003-Ohio-344, ¶24 (rejecting mother's argument that children services agency failed to use reasonable efforts when mother was unwilling to cooperate in establishing a case plan, failed to visit the child, and otherwise impeded the agency's efforts).

### e. Father

{¶78} Turning to the father, the circumstances differ. It does not appear the trial court ever entered any finding regarding LCCS's efforts concerning the father. But even if the trial court erred by failing to make a reasonable efforts finding concerning the father,[1] the error did not affect the outcome of the proceedings, i.e., it was harmless. See R.C. 2501.02 (stating that appellate courts review for prejudicial error); Civ.R. 61 (stating that courts "must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties"); App.R. 12(B) (explaining that reviewing court may reverse trial court's judgment if it finds prejudicial error); *In re Keaton*, 4th Dist. Ross No. 04CA2785, 2004-Ohio-6210, ¶72 (stating that trial court's failure to make reasonable efforts finding "may be harmless error if it is apparent from the record that the agency used reasonable efforts").

{¶79} The primary obstacles to reunifying the father with the child were his continued criminal behavior and resulting five-year prison sentence. At the time of the permanent custody hearing, the father still had more than two years of imprisonment remaining. LCCS asserted that it did not include the father in the case planning efforts due to his incarceration. This court and others have previously indicated that an agency's failure to develop a specific reunification plan was reasonable when a parent is imprisoned. *In re N.A.P.*, 4th Dist. Washington No. 12CA30, 2013-Ohio-689, ¶45 (parent's four-year prison sentence "made it impossible to provide meaningful case planning services and to attempt reunification with appellant"); *In re S.D.*, 10th Dist.

---

[1] Under R.C. 2151.419(B)(1), a trial court that is required to make a reasonable efforts determination in accordance with R.C. 2151.419(A) must issue written findings of fact in support of its decision. However, it is unclear whether this requirement applies under the *C.F.* exception, i.e., although R.C. 2151.419(A) does not apply to permanent custody motions, the agency must demonstrate that it used reasonable reunification efforts at the permanent custody hearing if it did not already do so.

Franklin Nos. 08AP–546 and 08AP-575, 2009–Ohio–1047, ¶14 ("Under the

circumstances, [the parent's] criminal conduct had made it difficult, if not impossible, for

FCCS to provide meaningful services."); *In re A.D.*, 2nd Dist. Miami No. 2007CA23,

2008–Ohio–2070, ¶8 ("Although [children services'] efforts were directed solely toward

[the mother], such an approach was reasonable considering that [the father] was

incarcerated when the children entered temporary custody and would remain

incarcerated for another two and one-half years."); *In re Meadows*, 4th Dist. Scioto No.

05CA3009, 2005-Ohio-5018, ¶16; *Elmer v. Lucas Cty. Children Serv. Bd.*, 36 Ohio

App.3d 241, 244, 523 N.E.2d 540 (6th Dist. 1987) ("[T]here is no need to implement a

reunification plan when it would be futile.").  "Obviously, when a parent is imprisoned,

reunification is futile until the parent is released and obtains a stable home."  *N.A.P.* at

¶45. Accord Bean, *Reasonable Efforts: What State Courts Think*, 36 U. Tol. L. Rev.

321, 366, fn. 222 (2005) (citation omitted) ("The larger obstacle to successful

reunification in cases where the parent is incarcerated, however, is the lack of a

foreseeable and timely reunification.  The health and safety of a child will almost always

require that any reunification be within the foreseeable future and within a reasonable

time.  A parent incarcerated for any length of time longer than a few months quite

obviously faces a significant barrier to reunification, no matter what efforts the agency

makes.").

{¶80}  Furthermore, as that commentator noted:

> Courts treat incarceration as a circumstance created by the parent.  The parent, therefore, cannot complain that the agency failed to identify a way to circumvent the resulting obstacles. * * * [P]arents who are incarcerated are in prison as a result of their own misdeeds and cannot shift the blame for termination to state agencies for failing to provide all the services they could.

Bean, *Reasonable Efforts: What State Courts Think*, 36 U. Tol. L.Rev. 321, 349, citing

*In re J.K.*, No. 03-1413, 2003 WL 22346526, at *2 (Iowa Ct. App. Oct. 15, 2003).

**{¶81}**  The Ninth District Court of Appeals, however, has criticized the notion that

the failure to implement a reunification plan may be reasonable even when the facts and

circumstances would render it futile.  *In re S.R.*, 9th Dist. Summit No. 27209, 2014-

Ohio-2749, ¶ 35-40.  The *S.R.* court explained:

> R.C. 2151.419(A)(2) now authorizes the trial court to relieve the agency of its obligation to make reasonable reunification efforts if it finds that one of five enumerated circumstances exist, which the legislature has implicitly determined justify a lack of reunification efforts between parent and child.  Those limited circumstances are when "the parent from whom the child was removed:" has been convicted of certain violent or dangerous crimes against the child, sibling, or another child living in the home; has repeatedly withheld food or medical treatment from the child without a legitimate excuse; has repeatedly placed the child at risk of harm due to alcohol or drug abuse and has rejected treatment; has abandoned the child; or has had her parental rights to a sibling of the child involuntarily terminated.

> Absent a judicial finding that one of the circumstances enumerated in R.C. 2151.419(A)(2) exists, a children services agency is obligated to make reasonable reunification efforts and has the burden of demonstrating to the court that it made those efforts.  *See* R.C. 2151.419(A).

Id. at ¶¶39-40.

**{¶82}**  And, in *C.F.*, at ¶ 4, the Ohio Supreme Court held that "except for some

narrowly defined statutory exceptions, the state must make reasonable efforts to reunify

the family before terminating parental rights."  However, the reasonable efforts statute,

R.C. 2151.419, does not use the phrase "reunify the family."  Instead, it requires the

agency to use reasonable efforts "to prevent the removal of the child from the child's

home, to eliminate the continued removal of the child from the child's home, or to make

it possible for the child to return safely home."  This raises a question as to what is

meant by "family," what is meant by "home," and whether the *C.F.* duty "to reunify the

family" extends to all family members, including a parent with whom the child was not living at the time of removal, or just to the family member from whose care the child was removed. *See generally In re M.R.*, 3rd Dist. Defiance No. 4-11-12, 2011-Ohio-6528, ¶¶15 and 17; *In re A.P.*, 9th Dist. Medina No. 12CA0022-M, 2012-Ohio-3873, ¶¶ 28-29; R.C. 2151.419(B) (stating that trial court's reasonable efforts finding shall briefly describe the services provided to "the family of the child"). None of the parties, however, have raised any of these issues. We therefore do not address them now. *See Risner, supra*, at ¶28.

{¶83} Although we recognize both In re C.F. and In re S.R., the question as we see it, is whether the concept of "reasonable efforts" includes attempting reunification with a parent who is serving a five-year prison term and whose stated term will not expire for at least two years past the date of the permanent custody hearing. In our view attempting reunification with such an incarcerated parent would be an unreasonable effort because of the obvious fact that the incarcerated parent lives in a prison; there is no possibility of reunifying the parent and child while the parent is imprisoned. The statute requires reasonable efforts, not unreasonable ones. In certain situations reunification may be possible upon the parent's release. However, in this case the father will not be released for two years beyond the permanent custody hearing. Beyond maintaining the child in its temporary custody pending the father's release from prison, we are not certain what other efforts LCCS could have undertaken to remove the obstacle preventing reunification between the father and the child. The permanent custody statutes do not appear to contemplate holding a child in custodial limbo while a parent completes a lengthy prison term. *See* R.C. 2151.413(D)(1)

(requiring children services agency to seek permanent custody when a child has been in its temporary custody for more than twelve out of the past twenty-two months); R.C. 2151.414(D)(2)(b) (stating that court shall award agency permanent custody if it finds, among other things, that the child has been in an agency's custody for two years or longer).  Thus, under our facts attempting a specific reunification strategy between the father and child would not be a reasonable effort, but rather an unreasonable one.

{¶84}  We reiterate that we are not ignoring the Ohio Supreme Court's holding in *C.F.*  Nor are we holding that a children services agency never has a duty to develop specific reasonable efforts to attempt to reunify a child with an incarcerated parent. Instead, we are recognizing that under the facts presented here, attempting reunification with the father would go beyond being reasonable.  In other words, we conclude the agency made a reasonable effort to "reunify the family", as *C.F.* and the statute require.

{¶85}  Moreover, LCCS did not completely ignore the father.  Compare *S.R.*, *supra*.  Instead, it investigated his situation and discovered that he was incarcerated and would remain incarcerated through December 2017.  Caseworker Ferguson explained at the permanent custody hearing that it did not offer services to the father while he was imprisoned due to the lack of certified services available in prison.  Thus, this is not a situation whether the agency totally ignored a natural parent, but instead, a situation where an agency investigated the possibility of placing a child with a natural parent but determined that placement within a reasonable time would be impossible due to the parent's incarceration. It would make little sense to require the agency to develop a plan that the facts of situation made impossible to implement.

**{¶86}** Because the record reveals the agency exercised reasonable efforts to reunify the family, the trial court's error in failing to make a specific finding concerning the father is harmless and did not affect the outcome of the proceedings.

### 4. CASE PLAN

**{¶87}** The father also contends that LCCS did not properly file a case plan, he did not agree to a case plan, he did not sign a case plan, and LCCS did not include him in a case plan. As pointed out earlier, the trial court adopted the case plan as part of its dispositional order. Yet the father did not raise any of these objections before the trial court at a time when it could have corrected any error. Consequently, he has forfeited them for purposes of appeal. *See In re N.L.*, 9th Dist. Summit No. 27784, 2015-Ohio-4165, 33 (stating that "[a] party may not object to matters regarding case plan implementation for the first time on appeal," but instead, "should be brought to the attention of the trial court at a time when they might be addressed"); *In re Willis*, 5th Dist. Coschocton No. 02CA15, 2002-Ohio-6795, 10 (determining that appellant's failure to object to case plan during trial court proceedings waived right to raise issue on appeal); *In re Awkal*, 95 Ohio App.3d 309, 319, 642 N.E.2d 424 (8th Dist. 1994) (holding that appellant's failure to object to case plan during trial court proceedings waived right to raise issue on appeal).

### IV. CONCLUSION

**{¶88}** Accordingly, we overrule the mother's sole assignment of error, the father's two assignments of error, and affirm the trial court's judgment. In doing so we recognize this unfortunately is yet another case in which the parents should have made better life choices in order to preserve a parent-child relationship. The mother has

abandoned her child for a life of self-indulgence.  We do not doubt the bond that C.B.C. has forged with his father.  And the father professes that being imprisoned once in Kentucky for eighteen months and currently in Ohio for up to 5 years has reformed him so that he now understands the importance of being a law-abiding citizen in order to care for his child. However, the father apparently did not learn this lesson after his Kentucky imprisonment, when he had custody of C.B.C.  The father states that C.B.C. is the most important part of his life, yet when he last had custody of him, the father was unable to refrain from criminal activity and ended up with yet another prison sentence. This child deserves to be placed in a home environment where he will not have to worry about where he will live if his father is sent back to prison.  Thus, waiting for the father to be released from prison would not offer the same promise of stability that awaits the child by the court's decision granting LCCS permanent custody.

{¶89}  Moreover, had the court placed C.B.C. with Tonya Moore pending the father's release, the same uncertainty surrounding his ultimate success living with his father would remain.  Whether the father would remain free from incarceration after his next release is open to speculation.  C.B.C. deserves more than a possibility of a legally secure permanent placement, especially considering the instability he has experienced over the past several years, i.e., living with his drug-addicted mother who did not provide even the basic necessities for him and who did not ensure that he attended school, staying with friends because he did not like being around his mother and her friends who kept him awake while they "partied," living with relatives, living with his father, living with his drug-addicted mother again and spending nights at his friend's house so that he could avoid his mother's lifestyle.  There is no doubt that C.B.C. has

suffered emotional distress as a result of his mother's horrendous parenting and his father's inability to remain a law-abiding citizen. In the long-term, awarding appellee permanent custody will better promote C.B.C.'s best interest than holding him in constant limbo, wondering when his father will be released from prison and if his father will remain a law-abiding citizen able to provide care for him.

**{¶90}**  Difficult as it may be for C.B.C. to accept, we agree with the trial court that his best interest requires more than a temporary living arrangement with a family friend, followed by living with his father who may have finally seen the error in his ways.  The father had that option once to be a law abiding citizen when his child lived with him, and apparently was unable to refrain from criminal activity, despite having at least some awareness of the ramifications of his criminal conduct.  Courts need not experiment with a child's welfare to see whether the outcome will be a benefit or a detriment. *In re A.C.H., supra*. We are sympathetic to C.B.C.'s ardent desire to live with his father—but sometimes severing a familial bond will provide a child with a better chance to lead a successful life, and will hopefully prevent C.B.C. from suffering the same fate that has befallen his parents.

JUDGMENT AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that Appellants shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Lawrence County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. & Hoover, J.:  Concur in Judgment and Opinion.


For the Court



BY: _____
        William H. Harsha, Judge



**NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**