[Cite as *In re B.H.*, 2016-Ohio-5447.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
HOCKING COUNTY

IN THE MATTER OF:

|  |  |  |
|---|---|---|
| B.H., D.H., L.H., and M.H., | : | Case Nos. 16CA1 |
|  | : | 16CA2 |
|  | : | 16CA3 |
|  | : | 16CA4 |
|  | : |  |
| ADJUDICATED DEPENDENT | : |  |
| CHILDREN. | : | DECISION AND |
|  | : | JUDGMENT ENTRY |
|  | : |  |
|  | : | RELEASED 08/15/2016 |

## APPEARANCES:

David J. Winkelmann, Millfield, Ohio, for Appellant.

Kyle C. Henderson, Hocking County Prosecuting Attorney, and Ann Allen McDonough, Hocking County Assistant Prosecuting Attorney, Logan, Ohio, for Appellee.

Hoover, J.

{¶1}    Appellant, B.G., appeals the trial court's judgments that awarded appellee, South Central Ohio Jobs and Family Services (SCOJFS), permanent custody of her four biological children: (1) ten-year-old B.H.; (2) eight-year-old D.H.; (3) seven-year-old L.H.; and (4) five-year-old M.H. For the reasons that follow, we affirm the trial court's judgment.

### I.  Facts and Procedural History

{¶2}    On August 6, 2014, appellee filed abuse, neglect, and dependency complaints concerning the four children.[1] At a shelter care hearing, the court placed the children in appellee's temporary custody. Appellee later dismissed these complaints.

{¶3}    On December 3, 2014, appellee filed dependency complaints concerning the four children. The complaints alleged that (1) appellee has been involved with the family since February 2012; (2) in November 2013, the children were returned to their mother; (3) in July 2014, the mother and her boyfriend were reportedly using heroin and living at a homeless shelter; (4) the mother sent the children to reside with the maternal grandparents; and (5) the maternal grandfather subsequently was charged with theft after he was discovered stealing from a graveyard while two of the children were present. Appellee requested that the court award it temporary custody of the children. At a shelter care hearing, the court placed the children in appellee's temporary custody.

{¶4}    On February 20, 2015, the trial court adjudicated the children dependent and placed them in appellee's temporary custody. On August 12, 2015, appellee filed motions for permanent custody of the children.

{¶5}    On December 7, 2015, the trial court held a hearing to consider appellee's permanent custody motions. SCOJFS caseworker Rebecca Carter testified that she started working with the family in February or April 2012. Carter stated that appellee offered numerous

---

[1] The procedural histories of the permanent custody cases are extremely confusing due to an unorthodox filing system the trial court employed. It appears each child was assigned an "ID" number; and any filing pertaining to that child was filed under this "ID" number. Thus, the record transmitted on appeal contains filings from case numbers that have not been appealed or that were dismissed, such as a case the grandparents filed to obtain custody of the children. Moreover, not all of the filings are organized by case number within the same set of files. For instance, the August 6, 2014 complaint filed in B.H.'s case is not contained in the file that bears an identifying tag with that same case number, 21430099. Instead, it is contained in the case file that appears to have begun with the grandparents' February 28, 2012 pro se motion for custody. This filing system is apparently what led appellee to file its permanent custody complaints in the wrong case numbers, i.e., cases that had been dismissed, and what led this court to remand the matter to the trial court in order to correct the clerical errors associated with the case numbers. In the future, the court may wish to review its filing system.

services to the mother, but the mother was not able to consistently comply with the case plan or provide proper care for the children. Carter testified that the mother complied for a time and had custody of the children for about eight months between February 2012 and August 2014. Carter explained that one of the mother's case plan requirements was that she not take the children to the grandparents' home. Carter stated that appellee "had concerns with the grandparents with their drug and alcohol abuse reported by" B.H. She stated that the mother last visited the children on February 9, 2015.

{¶6} Carter testified that the children's father wants to reunify with the children; but he has not complied with the case plan. He has been in jail; and the last time he saw the children was in the summer of 2012.

{¶7} Carter explained that appellee investigated relative placements but found none suitable for the children. She stated that the children lived with the maternal grandparents when the children were removed in 2012; but shortly thereafter, the "grandparents had contacted us and said they can't keep the boys, their health was too bad, and they couldn't control them, and it was just too much strain on them." Carter explained that the grandparents indicated they could keep the oldest child; thus, appellee removed the three younger children and the oldest child continued living with the grandparents. Later, the grandparents had a domestic violence incident in which "a sheriff was involved, drugs [were] involved." The grandfather "took off with [B.H.], drove to Logan, wrecked the car, passed out, was taken by EMS because a neighbor notified the police, [and] he was taken to the hospital." B.H. then was placed with his other siblings. Carter explained that appellee investigated the grandparents for placement but did not approve their home "due to the past history of the grandparents of domestic violence and the drugs and due to

the home conditions of the grandparents, the boys not getting fed, and then the grandfather taking two of the boys to a graveyard to steal copper and getting arrested for it."

{¶8}    Carter testified that the children struggled when they first arrived in foster care; and they wanted to see their mother. She stated that "they eventually got to where they didn't [want to see their mother]." The children have been in the same foster home since the 2014 removal and "are very happy and well-adjusted in this home. They call the foster mom, 'mamaw' * * * and she has made sure to keep them involved with getting their school work done." Carter stated that the children share a room in the foster home; and they have an outdoor "play area with a great big play swing set." Carter explained that the foster mother also is involved with the children's extracurricular activities. She stated that the children "are part of the family."

{¶9}    Carter testified that awarding appellee permanent custody is in the children's best interest because they "are in a good placement;" and the foster mother indicated that she would like the children on a permanent basis. Carter stated that the children "are very settled in [the foster home]. They love living there. They say they like to see their mom and/or dad. Don't want to live with them [sic]. Do not want to live with grandparents [sic]. They are forgetting some of that past history * * * and * * * seem to be moving on and being settled in a place that they can call home and they have stated that it feels like home there and a family * * * [sic]."

{¶10}  Rikki Grace testified that she has counseled B.H. and M.H. since August 2014. When she first started counseling M.H., he reported nightmares. Grace stated that M.H. no longer has nightmares. Grace explained that when she started counseling with B.H.,  he "was having issues as far as behavior. There was a lot of rough play between the boys * * *. He also had made it known that he wanted to be at his grandparents['] house at the beginning." She

stated that B.H. initially did not like being in foster care; but his attitude has changed "drastically." B.H. and M.H. informed her that they feel "safe and well taken care of in [the foster] home." The children indicated that they love their mother; but they have negative feelings for her boyfriend. The children rarely discuss their father.

{¶11} Jorden Meadows, the children's guardian ad litem, stated that she believes awarding appellee permanent custody is in the children's best interest. She explained that the children "desperately need stability." Meadows testified that the children "are bonded;" and that they indicated they feel "safe" and "like a family" with the foster family. She stated that the children do not want to leave the foster home, "unless it is to go live with one of their parents, but * * * they realize that that's not likely to happen." Meadows explained that the children miss their parents and their "grandparents at times." She stated that the three of the children indicated that they wanted to see their grandparents and parents "so they can get a toy." Meadows testified that the children's statements that they wanted to "get a toy" led her to believe that they did not have a bond with either the parents or the grandparents. She stated: "I  mean for the only reason they want to see their parents so they can get a toy, not so that they can hug them, get kisses, you know, be a family with them, just so that they can get a possession [sic]." Meadows explained that the children did not "act like that when talking about" the foster mother. "They wanted to be with her. They loved being there. They actually have this playroom off the kitchen that they were so proud to show me. It has a TV in it and all sorts of toys and they can go in there and relax and have fun after doing their homework and they were just filled with enthusiasm about where they were and couldn't wait to show me everything." Meadows stated that she believes the foster home is "the best place for [the children]."

{¶12}  Meadows testified that she discussed relative placements with Carter; but Carter stated that they had been "ruled out." Meadows explained that she asked the mother about other placements, and the mother "specifically said she did not want [the children] to go to [the maternal] grandparents." She additionally related that appellee informed her that the grandparents' "home was already declared not fit prior to [her] involvement" in the case.

{¶13}  Meadows stated that in October 2015, she spoke with B.H. about living with his grandparents. B.H. stated that he would like to see his grandparents; but he does not want to live with them. Meadows testified that the children are in a foster-to-adopt home, that the foster mother would like the children to live with her, and that the children "certainly" would like to live there. She informed the court that she believes keeping the children in their current placement and granting appellee permanent custody is in their best interests.

{¶14}  On December 22, 2015, the trial court granted appellee permanent custody of the children. The court found that the children have been in appellee's temporary custody for twelve out of the past twenty-two months. The court also determined that awarding appellee permanent custody of the children would serve their best interests. The court considered the children's interactions and interrelationships. The court found their relationship with their mother to be "nonexistent." The court noted that the mother did not appear for recent court hearings (including the permanent custody hearing), has not attempted to work on her case plan, and has shown no interest in reunifying with the children. The court found that the mother essentially abandoned the children.

{¶15}  The court also determined that the children's father has abandoned the children. The court observed that the father has not had any contact with the children since the summer of 2012; and his present whereabouts are unknown.

{¶16} The court noted that the maternal grandparents had temporary custody of the children numerous times; but that the guardian ad litem indicated that they are not a suitable placement for the children. The court further stated: "In fact the Court has a no contact order in effect between the maternal grandparents and [the children]."

{¶17} The court observed that the children have a loving relationship with the foster family and are in the same home. The court recognized that B.H. initially "was reluctant" about foster care; but B.H. now would like to remain in the foster home. The court also noted that the guardian ad litem stated that B.H. would like to see his mother but not live with her; B.H. is well-adjusted to his foster home; M.H. "has blossomed in foster care;" and L.H. and D.H. are doing well in the foster home.

{¶18} The court considered the children's wishes via the guardian ad litem. The guardian ad litem indicated that the children would like appellee to obtain permanent custody so that they can remain in the foster home. The guardian ad litem further indicated that the children hope to stay in the foster home "long term."

{¶19} The court reviewed the children's custodial history and found that they were in their mother's custody until 2012, when appellee obtained temporary custody. The court found that the children have been placed in their maternal grandparents' custody several times and were removed from their care in August 2014. Since August 2014, the children have remained in appellee's temporary custody.

{¶20} The court further determined that the children need a legally secure permanent placement and that this type of placement cannot be achieved without granting appellee permanent custody. The court found that the children lack any parental bond with their mother or father, that neither parent has worked with the service providers, that both parents essentially

abandoned the children, and that no suitable relative placement is available. The court thus

granted appellee permanent custody of the children. These appeals followed.

## II.  Assignment of Error

{¶21}  Appellant raises one assignment of error.

> The trial court erred when it accepted Children Services decision [sic] not to place the
> children with their maternal grandparents.

## III. Law and Analysis

{¶22}  In her sole assignment of error, appellant essentially asserts that the record does

not contain clear and convincing evidence to support the trial court's finding that awarding

appellee permanent custody is in the children's best interests. Appellant does not dispute that the

children have been in appellee's custody for twelve of the past twenty-two months. She also does

not appear to challenge the court's finding that the children should not be returned to her care.

Instead, appellant argues that the trial court was required to find, by clear and convincing

evidence, that the maternal grandparents were unsuitable caregivers for the children before the

court could award appellee permanent custody.

## A.  Standard of Review

{¶23}  A reviewing court generally will not disturb a trial court's permanent custody

decision unless the decision is against the manifest weight of the evidence. *In re R.M.,* 2013–

Ohio–3588, 997 N.E.2d 169, ¶ 53 (4th Dist).

> "Weight of the evidence concerns 'the inclination of the greater amount of
>
> credible evidence, offered in a trial, to support one side of the issue rather than the
>
> other. It indicates clearly to the jury that the party having the burden of proof will
>
> be entitled to their verdict, if, on weighing the evidence in their minds, they shall
>
> find the greater amount of credible evidence sustains the issue which is to be

established before them. Weight is not a question of mathematics, but depends on

its effect in inducing belief.' "

*Eastley v. Volkman,* 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d 517, ¶ 12, quoting *State*

*v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary*

1594 (6th Ed.1990).

{¶24} When an appellate court reviews whether a trial court's permanent custody

decision is against the manifest weight of the evidence, the court " ' "weighs the evidence and all

reasonable inferences, considers the credibility of witnesses and determines whether in resolving

conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest

miscarriage of justice that the [judgment] must be reversed and a new trial ordered." ' " *Eastley*

at ¶ 20, quoting *Tewarson v. Simon,* 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001),

quoting *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717

(1st Dist.1983). *Accord In re Pittman,* 9th Dist. Summit No. 20894, 2002–Ohio–2208, ¶¶ 23–24.

{¶25} In a permanent custody case, the ultimate question for a reviewing court is

"whether the juvenile court's findings * * * were supported by clear and convincing evidence."

*In re K.H.,* 119 Ohio St.3d 538, 2008–Ohio–4825, 895 N.E.2d 809, ¶ 43. "Clear and convincing

evidence" is: "[T]he measure or degree of proof that will produce in the mind of the trier of fact

a firm belief or conviction as to the allegations sought to be established. It is intermediate, being

more than a mere preponderance, but not to the extent of such certainty as required beyond a

reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of*

*Haynes,* 25 Ohio St.3d 101, 104, 495 N.E.2d 23 (1986). In determining whether a trial court

based its decision upon clear and convincing evidence, "a reviewing court will examine the

record to determine whether the trier of facts had sufficient evidence before it to satisfy the

requisite degree of proof." *State v. Schiebel,* 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990). *Accord In re Holcomb,* 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), citing *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118 (1954) ("Once the clear and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof."). "Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *R.M.* at ¶ 55.

{¶26} Once the reviewing court finishes its examination, the court may reverse the judgment only if it appears that the fact-finder, when resolving the conflicts in evidence, " 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin* at 175. A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the " 'exceptional case in which the evidence weighs heavily against the [decision].' " *Id.,* quoting *Martin* at 175; *accord State v. Lindsey,* 87 Ohio St.3d 479, 483, 721 N.E.2d 995 (2000).

{¶27} Furthermore, when reviewing evidence under the manifest weight of the evidence standard, an appellate court generally must defer to the fact-finder's credibility determinations. As the *Eastley* court explained:

> "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *

If the evidence is susceptible of more than one construction, the reviewing court is

bound to give it that interpretation which is consistent with the verdict and

judgment, most favorable to sustaining the verdict and judgment."

*Eastley*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, at ¶ 21, quoting *Seasons Coal*

*Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio

Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

## B. Permanent Custody Principles

{¶28}  A parent has a "fundamental liberty interest" in the care, custody, and

management of his or her child and an "essential" and "basic civil right" to raise his or her

children. *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re*

*Murray,* 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990); *accord In re D.A.,* 113 Ohio St.3d 88,

2007–Ohio–1105, 862 N.E.2d 829. A parent's rights, however, are not absolute. *In re D.A.* at ¶

11. Rather, " 'it is plain that the natural rights of a parent * * * are always subject to the ultimate

welfare of the child, which is the polestar or controlling principle to be observed.' " *In re*

*Cunningham,* 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.,* 300 So.2d

54, 58 (Fla.App.1974). Thus, the State may terminate parental rights when a child's best interest

demands such termination. *In re D.A.* at ¶ 11.

{¶29}  Before a court may award a children services agency permanent custody of a

child, R.C. 2151.414(A)(1) requires the court to hold a hearing. The primary purpose of the

hearing is to allow the court to determine whether the child's best interests would be served by

permanently terminating the parental relationship and by awarding permanent custody to the

agency. *Id.* Additionally, when considering whether to grant a children services agency

permanent custody, a trial court should consider the underlying purposes of R.C. Chapter 2151,

as set forth in R.C. 2151.01:

> (A) To provide for the care, protection, and mental and physical development of
>
> children * * * whenever possible, in a family environment, separating the child
>
> from the child's parents only when necessary for the child's welfare or in the
>
> interests of public safety;
>
> (B) To provide judicial procedures through which Chapters 2151. and 2152. of the
>
> Revised Code are executed and enforced, and in which the parties are assured of a
>
> fair hearing, and their constitutional and other legal rights are recognized and
>
> enforced.

### C. Permanent Custody Framework

{¶30}   R.C. 2151.414(B)(1) permits a trial court to grant permanent custody of a child to

a children services agency if the court determines, by clear and convincing evidence, that the

child's best interest would be served by the award of permanent custody and that any of the

following apply:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody
>
> of one or more public children services agencies or private child placing agencies
>
> for twelve or more months of a consecutive twenty-two-month period, or has not
>
> been in the temporary custody of one or more public children services agencies or
>
> private child placing agencies for twelve or more months of a consecutive twenty-
>
> two-month period if, as described in division (D)(1) of section 2151.413 of the
>
> Revised Code, the child was previously in the temporary custody of an equivalent

agency in another state, and the child cannot be placed with either of the child's

parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to

take permanent custody.

(d) The child has been in the temporary custody of one or more public children

services agencies or private child placing agencies for twelve or more months of a

consecutive twenty-two-month period, or the child has been in the temporary

custody of one or more public children services agencies or private child placing

agencies for twelve or more months of a consecutive twenty-two-month period

and, as described in division (D)(1) of section 2151.413 of the Revised Code, the

child was previously in the temporary custody of an equivalent agency in another

state.

(e) The child or another child in the custody of the parent or parents from whose

custody the child has been removed has been adjudicated an abused, neglected, or

dependent child on three separate occasions by any court in this state or another

state.

{¶31}  R.C. 2151.414(D) requires a trial court to consider specific factors to determine

whether a child's best interest will be served by granting a children services agency permanent

custody. The factors include: (1) the child's interaction and interrelationship with the child's

parents, siblings, relatives, foster parents and out-of-home providers, and any other person who

may significantly affect the child; (2) the child's wishes, as expressed directly by the child or

through the child's guardian ad litem, with due regard for the child's maturity; (3) the child's

custodial history; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.

{¶32}   Thus, before a trial court may award a children services agency permanent custody, it must find (1) that one of the circumstances described in R.C. 2151.414(B)(1) applies, and (2) that awarding the children services agency permanent custody would further the child's best interests.

{¶33}   In the case at bar, appellant does not challenge the trial court's R.C. 2151.414(B)(1) finding. Nor does she specifically dispute the court's finding that granting appellee permanent custody is in the children's best interests. Instead, appellant contends that the trial court was required to find, by clear and convincing evidence, that the children's maternal grandparents were unsuitable caregivers. We limit our review accordingly.

### D. Relative Placement

{¶34}   We have repeatedly rejected parents' arguments in permanent custody cases that a trial court was required to determine that relative placement was not in a child's best interest before awarding permanent custody to a children services agency. Most recently, in *In re M.H.*, 4th Dist. Athens No. 15CA39, 2016-Ohio-3407, ¶¶ 33-35, we stated:

> [A] trial court need not determine that terminating parental rights is "the only
>
> option" or that no suitable person is available for placement. *In re Schaefer,* 111
>
> Ohio St.3d 498, 2006–Ohio–5513, ¶ 64 (2006). Rather, R.C. 2151.414 requires
>
> the court to weigh "all the relevant factors * * * to find the best option for the
>
> child." *Id.* "The statute does not make the availability of a placement that would
>
> not require a termination of parental rights an all-controlling factor. The statute

does not even require the court to weigh that factor more heavily than other factors." *Id.* A child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security. *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324, 574 N.E.2d 1055 (1991). Therefore, courts are not required to favor relative or non-relative placement if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody. *Schaefer* at ¶ 64; *accord In re T.G.,* 4th Dist. Athens No. 15CA24, 2015–Ohio–5330, ¶ 24; *In re V.C.,* 8th Dist. Cuyahoga No. 102903, 2015–Ohio–4991, ¶ 61 (stating that relative's positive relationship with child and willingness to provide an appropriate home did not trump child's best interest). Additionally, we observe that "[i]f permanent custody is in the child's best interest, legal custody or placement with [a parent or other relative] necessarily is not." *In re K.M.,* 9th Dist. Medina No. 14CA0025–M, 2014–Ohio–4268, ¶ 9.

\* \* \* \*

Moreover, we recognize that "[f]amily unity and blood relationship" may be "vital factors" to consider, but neither is controlling. *In re J.B.,* 8th Dist. Cuyahoga Nos. 98518 and 98519, 2013–Ohio–1703, ¶ 31. Indeed, "neglected and dependent children are entitled to stable, secure, nurturing and permanent homes in the near term \* \* \* and their best interest is the pivotal factor in permanency case." *In re T.S.,* 8th Dist. Cuyahoga No. 92816, 2009–Ohio–5496, ¶ 35. Thus, while biological relationships may be important considerations, they are not controlling when ascertaining a child's best interest. *In re J.B.,* 8th Dist. Cuyahoga Nos. 98518 and 98519, 2013–Ohio–1706, ¶ 111.

*Accord In re C.B.C.*, 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016-Ohio-916, ¶¶ 66-67.

{¶35}  Similarly, *In re I.H.*, 3rd Dist. Allen No. 1-15-63, 2016-Ohio-2672, ¶ 26, the court stated:

> There is no requirement that a trial court find by clear and convincing evidence
> that a relative is an unsuitable placement option prior to granting permanent
> custody to an agency. *In re Dylan B.,* 5th Dist. Stark No. 2007–CA–00362, 2008–
> Ohio–2283, ¶ 67, citing *In re Shaefer,* 111 Ohio St.3d 498, 2006–Ohio–5513, at ¶
> 65; *In re S.E.,* 12th Dist. Clermont No. CA2008–05–045, 2008–Ohio–5300, ¶ 26,
> citing *In re Lewis,* 4th Dist. Athens No. 01CA20, 2001–Ohio–2618, *9 (Nov. 7,
> 2001). Indeed, the statutory duty imposed by R.C. 2151.414(B)(1) does not
> require a trial court to determine by clear and convincing evidence that the
> termination of a parent's rights is the only option. *In re Shaefer,* at ¶ 65. Instead,
> the statute requires the trial court to find the "best option" for the child once a
> determination is made under to R.C. 2151.414(B)(1). *Id.* "The statute does not
> make the availability of a placement that would not require a termination of
> parental rights an all-controlling factor." *Id.*

{¶36}  Based upon the foregoing authority, we disagree with appellant that the trial court had a duty to determine, by clear and convincing evidence, that the maternal grandparents were unsuitable caregivers before awarding appellee permanent custody. We further point out that nothing in the statutory framework requires a trial court to make a finding of relative unsuitability before terminating parental rights. Instead, whether a suitable relative placement is available is but one factor that a court considers when evaluating a child's need for a legally secure permanent placement.

{¶37} Moreover, the trial court in the case at bar examined the children's best interests and determined that awarding appellee permanent custody would be in their best interests. Thus, placing them with their maternal grandparents necessarily is not. *M.H.*, *supra*.

{¶38} Additionally, appellant has not specifically challenged the trial court's finding that awarding appellee permanent custody is in the children's best interest. We believe that the record contains ample evidence to support the trial court's finding that the children's best interests would be served by placing them in appellee's permanent custody. With respect to the children's interactions and interrelationships, the children appear to be thriving in foster care and share a loving relationship with their foster mother. The children's mother has not had contact with the children since February 2015; and the father has not seen them since the summer of 2012. The absence of the parents from their children's lives has weakened whatever parental bonds may have existed; and they have bonded to the foster family. The children's relationship with the grandparents appears to have been somewhat unhealthy. The grandparents returned the three younger boys to appellee, experienced domestic violence in their household, had substance abuse issues, and exposed at least two of the children to criminal acts.

{¶39} Concerning the children's wishes, the guardian ad litem clearly expressed that the children's best interests demand that they be placed in appellee's permanent custody. The children also indicated that they would like to stay in the foster home on a permanent basis.

{¶40} With respect to the children's custodial history, the evidence shows that they have not had a stable, permanent home since February 2012. Since that time, they have been placed in their grandparents' care on a few separate occasions, in appellee's temporary custody, in their mother's care, and in the foster home. Before August 2014, when the children were placed in

their present foster home, they had been shuffled among different places for more than two and one-half years.

{¶41} The evidence also shows that the children need a legally secure permanent placement; and they cannot achieve this type of placement without granting appellee permanent custody. Neither parent has demonstrated a willingness or ability to provide proper care for the children. Appellee did not find the maternal grandparents to be a suitable placement option for the children due to their substance abuse issues, domestic violence concerns, and other issues. Appellee did not locate any other suitable placement options.

{¶42} The totality of the evidence appellee presented at the permanent custody hearing clearly and convincingly supports the trial court's finding that awarding appellee permanent custody of the children is in their best interests. Consequently, the trial court's decision to grant appellee permanent custody of the children is not against the manifest weight of the evidence.

{¶43} Accordingly, based upon the foregoing reasons, we overrule appellant's sole assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

**JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED. Appellant shall pay the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Hocking County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Harsha, J.: Concurs in Judgment and Opinion.
McFarland, J.: Concurs in Judgment Only.

For the Court

By:_____
                   Marie Hoover, Judge

**NOTICE TO COUNSEL**

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.